# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX et al.,

       Plaintiffs – Judgment Creditors,

    v.                             03 Civ. 4466 (VM)(THK)

PALESTINE LIBERATION ORGANIZATION et al.,

       Defendants – Judgment Debtors.

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT

### Introduction

This action arises from the terrorist murder of Aharon Ellis on January 17, 2002. Aharon Ellis was shot to death, along with five Israelis, while performing as a singer at a bat mitzvah celebration in Hadera, Israel. This Court appropriately described that attack, in which a terrorist opened fired with a machine gun on the family of the bat mitzvah girl and hundreds of other celebrants, as "unprovoked savagery" and a "massacre of innocents." *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424, 448 (S.D.N.Y. 2004).

Though defendants baldly assert in support of the instant motion that Aharon Ellis' murder resulted from the "acts of a lone gunman" (Defs' Memo at 19), that is a blatant and knowing untruth. In fact, and as defendants are well aware, Aharon was murdered as the result of a carefully planned attack carried out by a team of PA security officers and PLO operatives. *See* Declaration of Dr. Leonard Hammer, Exhibit A, at ¶¶ 11-14.

The defendants have moved pursuant to Fed.R.Civ.P. 60(b)(6) for relief from the judgment entered in this action on August 1, 2006.[1]

Relief under Rule 60(b)(6) is of "extremely meagre scope," *Rinieri v. News Syndicate Co.*, 385 F.2d 818, 822 (2nd Cir. 1967) (internal quotations omitted), such relief "is generally not favored and is properly granted only upon a showing of exceptional circumstances," *United States v. International Bhd. of Teamsters*, 247 F.3d 370, 391 (2nd Cir. 2001) i.e. "in unusual and extreme situations where principles of equity *mandate* relief." *Blue Diamond Coal Co. v. Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) (emphasis in the original) (internal quotations omitted).

Defendants' motion does not even scratch the surface of this demanding standard. On the contrary, as shown below, defendants' motion is not only meritless, but frivolous, and constitutes nothing but another of the litigation abuses for which the instant defendants have been repeatedly castigated by this and many other courts in the United States. *See*, *most recently*, *Biton v. Palestinian Interim Self-Government Authority*, ___ F.Supp.2d ___, 2007 WL 2783171 * 1 (D.D.C. September 26, 2007); ("Defendants' recent filing represents only an effort to derail conclusion of this hoary litigation."); *Estate of Ungar ex rel. Strachman v. Palestinian Authority*, 841 N.Y.S.2d 61, 65 (1st Dept. August 16, 2007) (Noting the Palestinian "Authority's documented history of engaging in dilatory tactics to plaintiffs' detriment in the underlying and other litigation").

Accordingly, the plaintiffs respectfully request that the Court deny defendants' motion.

---

[1] While defendants' actual Motion references Rule 60(b) generally, their supporting Memorandum relies only on Rule 60(b)(6), *see id. passim*, and at Conclusion (p.19): "For the foregoing reasons, pursuant to Rule 60(b)(6) and in the interests of substantial justice, Defendants seek relief from this Court's default judgment of August 1, 2006."

## I.    DEFENDANTS' MOTION IS FACIALLY DEFECTIVE

Defendants' motion suffers from two overarching defects which, standing alone, are sufficient grounds to deny it with no further discussion.

### A.    Defendants Appealed and Then Abandoned Their Appeal

Defendants timely appealed the judgment, and on February 26, 2007, that appeal was dismissed for failure to prosecute. *See* dkt. nos. 88, 91. It is well established that arguments that were, or should have been, presented on appeal are not reviewable on a Rule 60(b) motion. *See e.g. U.S. v. Borchers*, 163 F.2d 347, 350 (2nd Cir. 1947) ("Motions to open and vacate do not lie as a substitute for a deliberately abandoned appeal"); *Cruickshank & Co., Ltd. v. Dutchess Shipping Co., Ltd.*, 805 F.2d 465, 467-468 (2nd Cir. 1986) (defendants' failure to appeal from judgment left them bound by the result and they could not employ Rule 60(b) as substitute for appeal); *Nemaizer v. Baker*, 793 F.2d 58, 61 (2nd Cir. 1986) (Rule 60(b) "may not be used as a substitute for a timely appeal."); *GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 373 (6th Cir. 2007) (arguments that were, or should have been, presented on appeal are not reviewable on a Rule 60(b) motion); *Martinez-McBean v. Government of Virgin Islands*, 562 F.2d 908, 911 (3rd Cir. 1977) ("it is improper to grant relief under Rule 60(b)(6) if the aggrieved party could have reasonably sought the same relief by means of appeal.").

All of the arguments asserted by defendants in the instant motion could have been raised in their appeal, and defendants cannot use Rule 60(b) to escape the consequences of their decision to abandon that appeal.

Accordingly, defendants' motion should be summarily denied.

Typically for these defendants, the "Facts" section of their motion papers carefully avoids

avoids any mention of their abandoned appeal, which they no doubt realize dooms the instant motion.

### B.    The Motion Is Unsupported by Affidavits

It is elementary that "[t]he burden of proof is on the party seeking relief from judgment." *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2nd Cir. 2004) (quoting *United States v. International Bhd. of Teamsters,* 247 F.3d 370, 391 (2nd Cir. 2001).

Accordingly, the factual predicates of a motion under Rule 60(b) must be supported by affidavits. *See e.g. New York v. Green*, 420 F.3d 99, 109-110 (2nd Cir. 2005); *Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 173 (2nd Cir. 2001); *SEC v. McNulty*, 137 F.3d 732, 740 (2nd Cir. 1998); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 683 (7th Cir. 1983); *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 n. 8 (5th Cir. 1994).

Yet, defendants' motion papers are chock-full of bald factual assertions which are not supported by any affidavits. Defendants' systemic and systematic failure to support the factual bases of their motion with affidavit testimony is further grounds to deny it summarily.

## II.    DEFENDANTS KNEW FULL WELL WHEN THEY REFUSED TO FILE AN ANSWER THAT THEY WERE NOT IMMUNE

On July 15, 2005, this Court ordered the defendants to answer the complaint in this action by no later than August 15, 2005. In response to that order, defendants' counsel wrote the Court on August 15, 2005, conveying defendants' decision that "no answer on the merits of the complaint will be filed." Letter from Ramsey Clark, Esq. to Marrero, J., August 15, 2005, Exhibit B.

Defendants now argue that Rule 60(b)(6) relief should be granted because – so they claim – their refusal to file an answer stemmed from their sincere belief that they were immune from the jurisdiction of the courts of the United States, and they were disabused of this belief only when set straight by the State Department in January 2007. *See* Defs' Memo at 3, 7, 11.

This factual assertion about defendants' state of mind should be rejected out of hand, in the first place, because a Rule 60(b) motion which turns on the movant's past state of mind must be denied unless supported by an affidavit. *See Merit Ins. Co.*, 714 F.2d at 683 (denying Rule 60(b) motion on ground that movant "was required, and it failed, to support its Rule 60(b) motion with affidavits that its officers did not know of the relationship" between adverse party and arbitrator); *Travelers Ins. Co.*, 38 F.3d at 1410 n. 8 (Rule 60(b) motion denied because movants "were obviously required, but failed, to support their motions with affidavits or other sworn proof that they did not know of Judge Mentz's club membership prior to July 23, 1993").

In the absence of an affidavit supporting this factual claim about defendants' past state of mind it can and should be summarily rejected, and the defendants' motion denied.

**Furthermore, the following facts prove beyond the shadow of a doubt that this claim is absolutely false, and that when defendants elected to default they knew perfectly well that they were not immune from jurisdiction of this Court**:

***First***, by August 2005, when defendants choose to default, this Court, another federal district court, and a federal court of appeals had already thoroughly considered and resoundingly rejected their sovereign immunity arguments. *See Knox v. Palestine Liberation Organization,* 306 F.Supp.2d 424 (S.D.N.Y. 2004); *Ungar v. Palestinian Authority*, 315 F.Supp.2d 164 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005).

Defendants therefore could not possibly have believed *circa* August 2005 that they had a viable immunity defense.

Nor should the Court credit any *post hoc* claim by defendants in their reply that they were banking on their petition to the Supreme Court for a writ of certiorari in respect to *Ungar*. That petition was denied in November 2005, *see Palestine Liberation Organization v. Ungar ex rel. Strachman*, 546 U.S. 1034 (2005), nearly half a year **before** Magistrate Judge Katz' Report and Recommendation on damages was submitted and eight months **prior** to entry of judgment. Yet, defendants submitted no briefing in respect to damages, filed no objections to the Report and Recommendation, did not file a motion to vacate default under FED. R. CIV. P, 55(c) and did not oppose entry of default judgment in any way, shape or form.

Clearly then, defendants' willful default did not derive from a belief that they were immune.

**Second**, defendants' own conduct subsequent to this Court's decision of March 2004 rejecting their sovereign immunity arguments, *Knox,* 306 F.Supp.2d 424, refutes their current claim. If, as defendants now assert, they believed that they enjoyed sovereign immunity from the jurisdiction of this Court, then following the March 2004 decision rejecting their immunity arguments defendants would have done one of two things: either they would have pursued an appeal of that decision, or they would have got up and walked away (which they did only in August 2005).

But defendants did neither. They filed and then ***abandoned*** an appeal of the immunity decision, *see* dkt. nos. 40, 46, 55, and continued to litigate the case. Indeed, the defendants of their own free will signed a stipulation agreeing to jurisdictional discovery regarding their contacts with the United States. *See* Stipulation endorsed on May 11, 2004, Exhibit C. Moreover,

in late November 2004 – long after their interlocutory appeal had been withdrawn – defendants submitted to the Court a letter from a senior PA official promising cooperation on the discovery requests. *See* letter from Deputy Speaker of the PA legislature, November 20, 2004, Exhibit D.

This conduct shows that even after their sovereign immunity arguments were rejected and their appeal of this Court's sovereign immunity decision had been withdrawn, defendants fully recognized their obligation to litigate this case, and did not dream for a moment that they could simply abandon this case with no consequences.

Simply put, if defendants believed that they were immune notwithstanding this Court's decision to the contrary – as they now claim to have then believed – why did they not appeal that decision or stop litigating in March 2004? Why did they get up and walk away only in August 2005? Indeed, why – if the defendants believed they were immune from the jurisdiction of this Court – did a senior PA official write a letter pledging to produce the discovery sought?

The answer is clear: defendants knew full well that if they did not obey the commands of this Court, they would default and face the consequences.[2]

**Third**, the defendants **had** to know in August 2005 that their default would have consequences – and exactly what those consequences would be – because in April 2005, the *Ungar* plaintiffs initiated extensive proceedings to enforce their judgment, and by June 2005 they had attached tens of millions of dollars in PA and PLO assets. These proceedings are detailed (in part) in a letter sent to Secretary of State Rice on June 18, 2005 by the PA's finance minister, in which the latter complains fulsomely about the difficulties purportedly being

---

[2] Thus, defendants' reference on page 12 of their memorandum to "their prior refusal to participate in this case beyond assertions of sovereign immunity and nonjusticiability" is false, and appears intended to gloss over the fact that defendants did indeed continue to participate in this case long after their sovereignty and justiciability arguments were rejected in March 2004 – a fact which, as defendants are aware, collapses the narrative about their prior

suffered by the defendants as a result thereof, and demands that the United States intervene in the proceedings on the defendants' behalf. *See* letter from Salam Fayyad to Condoleezza Rice, June 18, 2005, Exhibit E. *See also Ungar v. Palestinian Authority*, 2006 WL 1274986 (D.D.C. 2006) (detailing some of the Ungars' enforcement proceedings prior to August 2005).

Thus, when defendants decided several months later to default in the instant action, they knew without the slightest doubt not only that they were not immune from jurisdiction, but that default would *place their assets at risk*.

Notably, defendants' June 2005 letter to Secretary Rice *specifically references* the instant case. *See id.* at p. 2 n. 1. Yet, they still elected to default in this case in August 2005.

In light of all the above it is crystal clear that defendants knew full well that they were not immune from the jurisdiction of this Court, and that their current claim to the contrary is unadulterated fiction and a bad-faith *post hoc* attempt to rewrite history.

Similarly, the second prong of defendants' claim here – i.e. that they only realized that they should defend the case when shown the light by Secretary Rice's letter of January 2007 – is equally fantastic:

*First*, the defendants first wrote Secretary Rice in June 2005. Exhibit E. While defendants have not taken the trouble to inform the Court of her response to their 2005 letter (or, for that matter, of the very existence of their 2005 letter) it is fair to assume that it was substantively similar to her January 2007 letter.

*Second*, Secretary Rice's letter of January 2007 says nothing whatsoever about defendants' sovereign immunity claims, and thus could not possibly have disabused them of their putative "belief" that they were immune. Secretary Rice's letter says only "I encourage you, as I

---

state of mind upon which the instant motion is founded.

as I would any government, to respond to U.S. legal proceedings in good faith and a timely manner." Defs' Ex. 1. Hardly an Earth-shattering epiphany for the defendants.

*Third*, defendants defaulted their appeal only on February 26, 2007, ***a full six weeks after*** Secretary Rice's letter of January 12, 2007. Thus, if defendants' eyes had really been opened by the Secretary's revolutionary suggestion to "respond to U.S. legal proceedings in good faith and a timely manner," as they now claim, defendants had plenty of time to instruct Ramsey Clark to file an appellate brief.

*Fourth*, and most damning for defendants' entire tale here, on July 31, 2006 – i.e. a day before judgment was entered in this action and some six months before Secretary Rice's January 2007 letter – defendants filed a "Motion to File Answer Out of Time and to Vacate Entry of Default" in *Biton v. Palestinian Interim Self-Government Authority*, No. 01-382 (D.D.C). Exhibit F.

In that motion, defendants informed the *Biton* court that "A change of policy took place and the new President has informed counsel to litigate the cases," and sought on that basis to vacate their default and leave to file an answer out of time. Exhibit F. A copy of the proposed answer, contesting liability on the merits, was also filed by defendants. Exhibit G.

Defendants' filings in *Biton* are proof positive that they knew full well that they were not immune, and needed no edification whatsoever from the State Department in that regard.

## III.    LITIGANTS CAN NEVER BE RELIEVED FROM INTENTIONAL DEFAULTS

One of the "three principal factors" to be considered by a Court deciding a motion for relief from a default judgment under Rule 60(b) motion is "whether the default was willful." *New York v. Green*, 420 F.3d 99, 108 (2nd Cir. 2005). In the usual case, a court considering a Rule

Rule 60(b) motion has to study the record and decide, usually by inference, whether the default was willful. *See e.g. id.* at 109 ("Defendants offered no explanation for their counsel's failure to appear or seek any extension of time to respond to the complaint.").

Here, in stark contrast, the instant defendants have spared the Court the need to conduct such an inquiry: they informed this Court, in writing, that "Consistent with their position in the several cases pending in U.S. courts against them alleged to have occurred in Palestine or Israel … no answer on the merits of the complaint will be filed." Exhibit B.

Thus, by their own admission, defendants willfully defaulted this case because (at least until very recently) that has been their declared strategy in the "several cases pending in U.S. courts against them" under the Antiterrorism Act. This strategy has been duly noted by those courts:

> The Palestinian Defendants maintain that they constitute the present government of Palestine and are entitled to immunity because Palestine is a foreign state … However, their claims of immunity have been rejected … counsel for the Palestinian Defendants candidly admitted that, even if the motion for reconsideration were denied, they would not file an answer to the Amended Complaint but would continue with their present course of action and seek relief in the Court of Appeals.
>
> ***The Palestinian Defendants are free to pursue whatever strategy they deem best****.* However, Plaintiffs have a right to have this action proceed. The time for the Palestinian Defendants to answer this action has long since passed, and entry of default is now fully warranted.

*Ungar v. Palestinian Authority*, 215 F.R.D. 36, 39-40 (D.R.I. 2003) (emphasis added).

Similarly:

> The position taken by the Defendants in Knox was "[c]onsistent with their position in the several cases pending in U.S. courts against them alleged to have occurred in Palestine or Israel." *See* Pls.' Opp., Ex. A (Defendants' letter dated Aug. 15, 2005). The Defendants articulated the same position before the District Court

in Rhode Island … The Defendants essentially concede that their failure to answer the complaint in the instant case can similarly be traced to their instructions to their counsel. *See* Defs.' Mot. at 1 ("A change of policy took place and the new President has informed counsel to litigate the cases."). ***It is therefore clear to the Court that the Defendants' failure to file an answer timely was not due to "excusable neglect" but to a selected strategy***.

*Biton v. Palestinian Interim Self-Government Authority*, 239 F.R.D. 1, 4 (D.D.C. 2006) (emphasis added).

It is an iron-clad rule of federal jurisprudence that litigants can never be relieved from willful and strategic defaults under Rule 60(b). *See Ackermann v. U.S.*, 340 U.S. 193, 198 (1950) ("There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from" under Rule 60(b)). *See also e.g. U.S. v. Bank of New York*, 14 F.3d 756, 759 (2nd Cir. 1994) (Rule 60(b) relief is not available to a party who "makes a deliberate, strategic choice") (citing *Ackermann*); *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) ("A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding"); *Chang v. Smith*, 778 F.2d 83, 86 (1st Cir. 1985) (holding and citing cases for the "well established" principle that "improvident strategic choices" and "free, calculated and deliberate choices" are never grounds for relief from judgment) (internal brackets omitted); *Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996) (affirming entry of default against a foreign state on grounds that "if a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings in denying relief")

The fact that the defendants have now come to regret their decision is utterly irrelevant to Rule 60(b) analysis: "Although obviously better informed than foresight, an argument based on hindsight is not a ground upon which a court may grant Rule 60(b) relief." *Nemaizer v. Baker*,

793 F.2d 58, 60 (2nd Cir. 1986); *Cruickshank*, 805 F.2d at 467-468 (parties failure to appeal due to a miscalculation that they were judgment-proof cannot be corrected "under the guise of a rule 60(b)(5) motion."); *Federal's, Inc. v. Edmonton Investment Co.*, 555 F.2d 577, 583 (6th Cir. 1977) ("decisions deliberately made" are not grounds for relief from judgment even when "subsequent events reveal that such decisions were unwise").

Defendants took an intentional, strategic decision to default in this case. They are therefore not entitled to Rule 60(b) relief, period, and granting their motion would turn half a century of decisional law on its head.[3]

Defendants attempt to evade this fatal defect in their motion by asserting that a special rule of leniency applies to intentional defaults by "foreign governments." Defs' Memo at 6-7, 9-12. This argument fails for several reasons:

First, the case quoted by defendants for this purported rule, *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189 (2nd Cir. 1989) does not refer to "foreign governments" as defendants wishfully misquote that decision, but to "foreign sovereigns." *Id.* at 196. Neither the PA nor the PLO is a "foreign sovereign" and *First Fidelity* is therefore irrelevant to these defendants.

Moreover, the Second Circuit subsequently clarified that *First Fidelity* did ***not*** state any general rule of leniency in respect to foreign states, and was limited to the unique facts of that case:

> [R]elying on *First Fidelity Bank, N.A. v. Government of Antigua &*

---

[3] Even the defendants claim only that their decision to default was based on a mistaken belief that they were immune from jurisdiction, ***not*** that the default was unintentional. On the contrary, defendants' memorandum admits that the default was willful. *See e.g. id.* at 1 ("positions previously taken by Defendants") at 12 (defendants' "deliberate and ill-considered" decision and their "prior refusal" to litigate led to default) at 13 ("previous decision not to participate").

> *Barbuda-Permanent Mission,* 877 F.2d 189, 196 (2d Cir. 1989), BAF argues that the default judgment should be set aside under Rule 60(b)(6) because "default judgments are disfavored, especially those against foreign sovereigns." *Id.* at 196. It is true that the *First Fidelity Bank* court stated that "[c]ourts go to great lengths ... to permit [default] judgments against foreign sovereigns to be set aside." *Id.* But *First Fidelity Bank* was a distinctly different case than the one at hand. The issue in *First Fidelity Bank* was the extent to which the foreign sovereign defendant was bound by the actions of its ambassador to the United Nations and whether the district court had jurisdiction in the circumstances. This was a case which had "serious implications for the relationships between the United States and all foreign states that send duly accredited ambassadors to head their diplomatic missions in this country." *Id.* at 196-97 (Newman, J., dissenting). The case before us is fundamentally an ordinary contract dispute which has no such profound implications.

*Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 462 (2nd Cir. 1994).

Indeed, in *Transaero* the Second Circuit affirmed the district court's refusal to set aside a default judgment against a foreign state.

Likewise, in *Commercial Bank of Kuwait v. Rafidain Bank***,** 15 F.3d 238 (2nd Cir. 1994), the Second Circuit affirmed the district court's refusal to grant a foreign state relief from a default judgment. Defendants' claim that there is a special rule of leniency under Rule 60(b) for foreign states (or governments) is thus meritless.

Furthermore, in *Commercial Bank of Kuwait* the Second Circuit took pains to point out that *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986), which the instant defendants rely upon heavily (Defs' Memo 6, 9-11) is not the law in this Circuit, and that that case turned primarily on the finding that the FSIA does not apply retroactively.

In any event, a subsequent decision of the Eleventh Circuit, *Compania Interamericana Export-Import v. Compania Dominicana De Aviacion*, 88 F.3d 948, 951-952 (11th Cir. 1996), which affirmed a district court decision refusing to set aside a default entered against a foreign

state, demonstrates that *Jackson* created no rule of leniency even in the Eleventh Circuit.

Finally, and perhaps most importantly, in **none** of the cases cited by defendants had the defendants' sovereign immunity claim already been litigated, and in **all** of those cases the default judgments were set aside specifically because the court determined as a threshold matter of law that the FSIA did not apply retroactively (*Jackson*) or because the sovereign immunity issue – and thus the court's subject-matter jurisdiction – had not yet been litigated (*First Fidelity, Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989), *Hester Intern. Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989)).

Thus, (aside from the dispositive fact that the defendants are not foreign states) none of these cases are apposite here because the defendants' immunity arguments were thoroughly litigated and rejected long before their default, and the Court's subject-matter jurisdiction is not at issue.

Indeed, in *Gregorian*, the Ninth Circuit expressly held that a foreign state's belief that it was immune from U.S. jurisdiction would be considered "reasonable" – and its default therefore not "culpable" conduct under Rule 60(b) – only "until it has received a definitive indication to the contrary from the United States courts." *Gregorian*, 871 F.2d at 1525.

Therefore, since the instant defendants' immunity claims received not one but **multiple** "definitive indication[s] to the contrary from the United States courts" long in advance of their default, the defendants' default was clearly "culpable" even under the liberal rule set by the Ninth Circuit in *Gregorian*.[4]

---

[4] Notably, moreover, *Gregorian* applies only to the issue of whether an **acknowledged** foreign state, which is presumptively subject to the FSIA, reasonably believes that none of the FSIA exceptions to immunity applies. There is not the slightest evidence that *Gregorian* would apply to an entity **claiming to be** a "foreign state."

## IV.    THE JUDGMENT WILL NOT "CRIPPLE" THE PALESTINIAN ECONOMY NOR "DESTROY" THE PEACE PROCESS

Defendants argue breathlessly, and with dizzying hyperbole, that the judgment will "cripple" the Palestinian economy and "destroy" peace efforts, and that it therefore "threatens American interests in the Middle East." Defs' Memo at 8-12.

The Court should disregard these factual arguments summarily, because they are unsupported by any evidence. As noted, the defendants bear the burden of proof on this motion, and that burden includes the duty to back up factual allegations with affidavits. See *Marrero Pichardo*, 374 F.3d at 55; *New York v. Green*, 420 F.3d at 109-110; *Pecarsky*, 249 F.3d at 173; *SEC v. McNulty*, 137 F.3d at 740; *Merit Ins. Co.*, 714 F.2d at 683; *Travelers Ins. Co.*, 38 F.3d at 1410 n. 8.

Nothing could have been easier for the defendants than to attach an affidavit from an economist or their respective financial officials detailing their financial situations (assets, income, budgets, etc.) and demonstrating that if defendants were to pay the judgment – even in installments (*see* CPLR § 5226) – they would be ruined.

Defendants submitted no such affidavits because their claim is nonsense: defendants' have billions of dollars in assets and can easily afford to pay the judgment. *See e.g.* Exhibit H. Indeed, defendants attempted to sell this same story to the U.S. District Court in the District of Columbia, which rejected it as unsupported and false:

> [E]ven though Defendants make the legally irrelevant argument that their office in the District of Columbia would be threatened with closure if the funds in the Court registry were turned over to Plaintiffs, they present no facts to support it. Plaintiffs have indicated that Defendants have cash reserves in different entities in the United States, such as the Palestinian Investment Fund, and that Defendants can fund the operations of their Washington, D.C. office from funds they hold or control abroad. In their own Motion, **Defendants themselves implicitly acknowledge the existence of**

> ***such funds*** when they request an order from this Court "authorizing the payment of the normal operating expenses of its offices in Washington, D.C. from [the Wachovia] funds and when the funds are exhausted, from funds made available by transfers originating outside the United States."

*Ungar*, 2006 WL 1274986 *2 (D.D.C. 2006).

Indeed, as former United States Ambassador Martin Indyk has explained:

> Arafat for years would cry poor, saying, 'I can't pay the salaries, we're gonna have a disaster here, the Palestinian economy is going to collapse' … And we would all mouth those words: 'The Palestinian economy is going to collapse if we don't do something about this.' But at the same time, he's accumulating hundreds of millions of dollars.

Exhibit H.

The instant motion is just more of the same mendacious special pleading.

There is an additional – and overwhelming – reason that defendants' bald claims of a threat to the peace process and to U.S. interests in the Middle East should be rejected: these ***identical*** arguments – the alleged threat to the defendants' financial stability, to peace efforts and to U.S. interests – were all set forth in full hair-raising detail both in defendants' June 2005 letter to Secretary Rice (Exhibit E) and in yet another letter sent by defendants to Secretary Rice, in April 2006. *See* letter from Afif Safieh to Condoleezza Rice, April 27, 2006, Exhibit I.

Notably, the June 2005 letter specifically mentions this action (Ex. E at p. 2 n. 1) and the April 2006 letter refers to "seven other similar actions pending in U.S. Courts" (Ex. I at 1), and both letters demand that the United States appear in the proceedings to save the defendants from financial ruin and to safeguard the peace process and U.S. interests in the Middle East.

Clearly, if any of the threats to which defendants point were real, the United States would have filed a Statement of Interest in this case years ago.[5] The United States is not shy: when the *Ungar* plaintiffs sought to enforce their judgment against the PLO Mission to the United Nations (before Judge McMahon of this Court) the United States appeared in the proceeding within ***days***, and opposed it.

The United States' position was made perfectly clear in Secretary Rice's letter of January 2007: it is aware of these proceedings but will participate only to the extent that "U.S. legal interests or obligations are involved." Defs' Ex. 1.

Defendants' attempts to play State Department spokesman may thus safely be ignored.

Finally, defendants' argument that the Palestinian people will have to bear the cost of the judgment (Defs' Memo at 12) was raised and resoundingly rejected in *Ungar*:

> These Defendants argue that the ultimate burden of this compensation will be borne by an impoverished and oppressed Palestinian people who currently suffer from a continuing humanitarian crisis. Defendants are hard pressed to succeed with this argument given the fact that they deliberately stated their intentions not to participate in and thus, waived a hearing on damages.
>
> Defendants' arguments are offensive at best … ***The PA and PLO, and not an impoverished and oppressed Palestinian people, are responsible for and must bear the ultimate burden of providing compensation***, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to [the murder].

*Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 24-25 (D.R.I. 2004).

---

[5] Indeed, this Court's chambers *sua sponte* notified the office of the U.S. Attorney (apparently in May 2007) of one of plaintiffs' supplemental enforcement actions (No. 07-cv-03349-VM, involving the Palestine Monetary Authority), in order to give the Justice Department the opportunity of appearing if it so desired. (Counsel learned this from an Assistant U.S. Attorney who contacted us for a copy of the pleadings). The Executive Branch is thus more than well aware of these proceedings.

This Court should reject this argument for the same reasons. Furthermore, if the defendants were truly concerned about the Palestinian public fisc, they should have refrained from murdering Aharon Ellis in the first place, or at the very least from intentionally defaulting this case. To now ask this Court to be more concerned about Palestinian finances than they themselves were when they first murdered and then defaulted is the apogee of cynicism and temerity.

## V.    DEFENDANTS FAIL TO SHOW ANY MERITORIOUS DEFENSE

As shown above, defendants have presented no grounds whatsoever for relief from judgment under Rule 60(b). Moreover, the instant motion fails for the ***additional and independent*** reason that it presents no meritorious defense. "The existence of a meritorious defense is a key factor in the Rule 60(b) analysis. As a consequence, we have held that the absence of such a defense is sufficient to support a district court's denial of a Rule 60(b) motion." *New York v. Green*, 420 F.3d 99, 109 (2nd Cir. 2005) (internal quotations and brackets omitted).

While a Rule 60(b) movant is not required to prove her meritorious defense, she "must present more than conclusory denials" and she must provide affidavits or other admissible evidence supporting the factual elements of the defense. *Id*. (quoting *Pecarsky,* 249 F.3d at 173).

### A.    The Personal Jurisdiction Issue Is Foreclosed

Defendants argue at length that if the judgment were vacated, they would challenge the Court's *in personam* jurisdiction. Defs' Memo 13-17. This argument is utterly frivolous. The Court's jurisdiction over the defendants was conclusively determined prior to entry of default and well over a year before entry of default judgment, in the Court's decision of June 22, 2005. *See Knox v. Palestine Liberation Organization*, 229 F.R.D. 65 (S.D.N.Y. 2005).

That decision is unquestionably the law of the case. Not only was it intended to dispositively resolve the question of personal jurisdiction, but defendants failed to object timely to the magistrate judge's Report and Recommendation recommending a finding of personal jurisdiction (*see Knox*, 229 F.R.D. 68-69) and defendants thereby ***irrevocably waived*** their right to challenge that finding in this Court or on appeal. *See e.g. Davet v. Maccarone*, 973 F.2d 22, 31 (1st Cir. 1992) ("Failure to raise objections to the Report and Recommendation waives the party's right to review in the district court and those claims not preserved by such objection are precluded on appeal.")

Obviously, defendants cannot undo their waiver by defaulting the case and then filing a Rule 60(b) motion. Thus, granting the instant motion cannot possibly affect the validity of the Court's personal jurisdiction decision, and defendants therefore could not assert a personal jurisdiction defense even if the instant motion were granted.

### B.     Defendants' *Forum Non Conveniens* Arguments Are Unsupported and Contradict Their Arguments in Israeli Courts

Next, defendants assert that if the judgment were to be vacated, they would assert a *forum non conveniens* defense under the § 2334(d) of the ATA. Defs' Memo at 17-19.

In support of this putative meritorious defense, defendants assert that Israeli courts have subject matter and personal jurisdiction over the defendants, that the Israeli courts are "significantly more convenient and appropriate," and that Israeli courts offers a remedy "which is substantially the same as the one available in the courts of the United States." *Id.*

The fatal problem with all these assertions is that they are entirely factual and entirely unsupported. Defendants do not offer a scintilla of evidence – much less an affidavit – in support

of their *ipse dixit* claims about the jurisdiction of the Israeli courts and the remedies available

therein. Since these assertions are unsupported, they cannot constitute a meritorious defense:

> Defendants … assert certain affirmative defenses … ***However, Defendants failed to submit to the District Court even a single affidavit or any other evidence supporting their asserted defenses***. The District Court, therefore, rightly concluded that Defendants' assertions amounted to little more than conclusory denials. We have previously held that a "defendant must present more than conclusory denials when attempting to show the existence of a meritorious defense." *Pecarsky v. Galaxiworld.com, Ltd.,* 249 F.3d 167, 173 (2d Cir. 2001). Defendants have failed to satisfy this standard. As a result, the District Court did not err in concluding that Defendants failed to raise a meritorious defense.

*New York v. Green*, 420 F.3d at 109-110 (emphasis added).

Furthermore, defendants ***have concealed from this Court*** the fact that they are currently

(and for years have been) seeking dismissal of all cases brought against them in Israeli courts by

victims of terrorism, on the grounds that ***Israel is not a convenient forum for such suits***, and on

other threshold grounds. *See* Declaration of Daniel Reisner (submitted in the matter of *Biton v.*

*Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.)), Exhibit J, at ¶¶ 10-

17; Declaration of Dr. Leonard Hammer, Exhibit A, at ¶¶ 3-10.

Indeed, on July 30, 2007 – a mere 24 hours before the instant motion was filed –

defendants filed papers in a suit brought by terrorism victims in the Tel Aviv District Court

announcing defendants' intention to seek dismissal of the action on grounds of *forum non*

*conveniens*, nonjusticability, "act of state" and "act of war." See Exhibit A at ¶¶ 5-7.

Defendants' assertions here are therefore being made in gross bad-faith, and should be

summarily dismissed. Indeed, Rule 60(b)(6) relief is equitable, and therefore unavailable to

movants who conceal facts from the court and so have unclean hands.

Additionally, defendants' claim that the events of the murder (which defendants term an "incident") took place solely in Israel and that all defendants, witnesses and evidence are in Israel (Defs' Memo at 18) is patently untrue. First, neither the PA nor the PLO is "located in Israel" as the defendants bizarrely claim. *Id*. Second, as discussed in Dr. Hammer's Declaration, the acts of the conspiracy leading up to the murder and all the preparations therefor all took place in the West Bank, and the murderers were all residents of the West Bank. Exhibit A at ¶¶ 11-14.

Finally, defendants do not even claim that Israel would be a "significantly more convenient and appropriate" forum (*see* § 2334(d)(2)) for the plaintiffs. Nor could they. Most of the plaintiffs – Aharon Ellis' widow, Leslye Knox, and her six children – were forced to relocate to Georgia as a result of the murder, where they live in dire poverty. *See Knox v. Palestine Liberation Organization*, 442 F.Supp.2d 62, 69 (S.D.N.Y. 2006).

Leslye and the children are still in Georgia and are indigent, and it would be "absolutely financially impossible" for them to travel to Israel to litigate this case. *See* Declaration of Leslye Knox, Exhibit K, at ¶ 1-3. This fact – standing alone – is sufficient for the Court to determine that defendants would have no meritorious defense under § 2334(d) if the judgment were set aside.

### C.    Defendants Do Not Actually Dispute Liability and Provide No Affidavits in Respect Thereto

As discussed in Dr. Hammer's Declaration, Aharon Ellis was murdered by a group of PA officers and PLO operatives who were funded by and acting pursuant to the directives of the PA and PLO leadership. Exhibit A at ¶¶ 11-14. It is unsurprising, therefore, that nowhere in their motion do defendants actually ***dispute*** their liability for the murder. Rather, defendants say only

that "Plaintiffs should be required to make an affirmative showing of Defendants' liability" and that "Plaintiffs will not be able to demonstrate any such liability." Defs' Memo at 19.

Defendants do state that "If this case is adjudicated on its merits, Defendants will vigorously challenge Plaintiffs' allegations of liability," but this statement is insufficient. In order to raise a meritorious defense, defendants would have had to assert affirmatively – and in the present, not future, tense – that they are not liable. Furthermore, merely saying "we are not liable" would be conclusory and so insufficient, since a "defendant must present more than conclusory denials when attempting to show the existence of a meritorious defense." *Pecarsky,* 249 F.3d at 173. Thus, defendants would have had to explain why they are not liable for the actions of their officers and employees, particularly when two of them have been convicted of the murder of Mr. Ellis.

Moreover, any such statement would have to have been supported by affidavits. Since "Defendants failed to submit … even a single affidavit or any other evidence supporting their asserted defense[]" that they are not liable for Mr. Ellis' murder, they have per se failed to raise a meritorious defense and their Rule 60(b) motion must be denied. *New York v. Green*, 420 F.3d at 109-110.

Defendants know full well that they are liable for Aharon Ellis' murder, and it therefore comes as no surprise that their "front office" personnel were unwilling to subject themselves to a charge of perjury in a U.S. court by submitting an affidavit falsely disputing that liability.

In sum, defendants have failed to properly raise any meritorious defense. [6]

---

[6] Defendants also claim that they would contest damages if the judgment were opened. Defs' Memo at 19. This assertion is as conclusory as conclusory can be, and so can be summarily disregarded. *Pecarsky,* 249 F.3d at 173.

## VI.    OPENING THE JUDGMENT WOULD SEVERELY PREJUDICE THE PLAINTIFFS

In considering a Rule 60(b) motion, a court must weigh "whether and to what extent, vacating the default judgment will prejudice the non-defaulting party." *New York v. Green*, 420 F.3d at 110. The burden is on the movant "to show a lack of prejudice to the" non-moving party, and to present evidence showing that the non-moving party "would not suffer prejudice." *Id*. Defendants do not even assert, much less demonstrate, that no prejudice would be caused to the plaintiffs by the relief sought, and their motion can and should be denied for that reason alone.

Moreover, vacatur of the judgment would cause serious prejudice to the plaintiffs for several reasons. ***First***, Five and half years after the murder memories fade and documents are lost or destroyed. Many of the witnesses and much of the evidence which the plaintiffs would have sought are now longer available. For example, Mr. Arafat, who personally authorized payments to the terrorists who murdered Mr. Ellis (*see* Exhibit A), is dead. The whereabouts of other relevant witnesses is unknown. Furthermore, even if they wanted to, the defendants cannot produce witnesses or documents located in the Gaza Strip, because as of June 2007 they no longer have any foothold in Gaza. ***Second***, plaintiffs have expended hundreds of attorney hours and tens of thousands of dollars for the damages hearing, for the defendants' two abortive appeals and on collection proceedings necessitated solely by the defendants' scofflaw refusal to honor the judgment of this Court. It would be extraordinarily unjust and prejudicial to now wipe away those years of effort and expense. ***Third***, forcing Mr. Ellis' family to go through the trauma of testifying again about their agonizing ordeal would be "pure torture" for them. *See* Declaration of Leslye Knox, Exhibit K, at ¶ 4.

On this basis, too, the motion should be denied.

## VII.    THE MOTION WAS NOT FILED WITHIN A REASONABLE TIME

The instant motion was not filed "within a reasonable time" as required by Rule 60(b). All the arguments contained in this motion were set out in defendants' letter to Secretary Rice in June 2005, and therefore this motion could have been filed the day judgment was entered. Indeed, as shown above, on July 31, 2006 (a day before judgment was entered here), defendants attempted to set aside default and file an answer in the Biton matter. Exhibits F, G. Why could they have not done so here?

Even assuming for the sake of argument the truth of the ludicrous proposition that defendants only realized they should file this motion when they received Secretary Rice's letter of January 12, 2007, this motion is still untimely, since that letter was received by defendants some six months before they filed this motion. Thus, they could have instructed their previous counsel to file this motion last January. If for some reason they did not want Mr. Clark to file it, they could have hired new counsel at that time. Furthermore, defendants' new counsel began actively litigating defendants' other cases in May of this year. *See e.g. Biton v. Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.) dkt. #79 *et seq.*; *Shatsky v. Syrian Arab Republic et al*, Civ. No. 02-2280 (D.D.C.) dkt. #66 *et seq.* Yet, defendants' new counsel filed the instant motion only a leisurely two and a half months later.

It is clear, then, that this motion was not filed within a reasonable time.

## VIII.    THIS MOTION IS MADE IN BAD-FAITH

Defendants are not entitled to equitable relief under Rule 60(b)(6) because they are acting in bad faith in several ways. First of all, as shown above, this motion is founded on numerous

factual omissions and misstatements. Parties who seek to mislead the court are not entitled to equity.

Furthermore, it is pellucid that if the Court were to grant the instant motion and ultimately enter a new judgment in favor of the plaintiffs after trial, the defendants would not pay it. Not only does defendants' motion nowhere pledge to pay any new judgment, such a pledge would be demonstrably false: defendants continue to refuse to honor the *Ungar* judgment, which was entered over three years ago.

Thus, defendants' representation that they have "turned over a new leaf" as a result of Dr. Rice's letter, and are now prepared to respect and comply with the orders of the courts of the United States in good faith, is a full-blown fraud. Defendants are more than happy to invoke the power of our courts for their benefit – the instant motion being a good example – but will not respect the authority of the courts when it comes to paying a judgment.

This entire motion is therefore a "heads we win tails you lose" proposition, wherein the defendants can only win and the plaintiffs can only lose.

Since defendants are acting in bad faith, the instant motion should be denied.

## IX.    CONCLUSION

Defendants' motion should be denied in its entirety.

25

Dated: New York, New York
        October 2, 2007

                                Respectfully submitted,

                                **MCINTYRE, TATE, LYNCH & HOLT**
                                *Attorneys for the plaintiffs*

                                by:   *S/ David Strachman*

                                     David Strachman
                                321 South Main Street, Suite 400
                                Providence, Rhode Island 02903
                                (401) 351-7700

                                JAROSLAWICZ & JAROS, ESQS.
                                *Attorneys for the plaintiff*
                                225 Broadway, 24th Floor
                                New York, New York 10007
                                (212) 227-2780