## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLYE KNOX, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 03 CV 4466 (VM) |
| v. ) | |
| ) | |
| THE PALESTINE LIBERATION ) | |
| ORGANIZATION, THE PALESTINIAN ) | |
| AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION**

Richard A. Hibey
E-mail: rhibey@milchev.com
Mark J. Rochon
E-mail: mrochon@milchev.com
MILLER & CHEVALIER CHARTERED
655 15th St., N.W. Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202) 626-5801

*Attorneys for Defendants the Palestine Liberation
Organization and the Palestinian Authority*

TABLE OF CONTENTS

I.      RULE 60(B) PROVIDES THE APPROPRIATE VEHICLE FOR
        VACATUR ..................................................................................................................1

II.     RELIEF UNDER RULE 60(B) IS WARRANTED ........................................................3

        A.      **The Default Judgment Will Have Significant Foreign Policy
                Consequences.**...............................................................................................3

        B.      **The Default Judgment Will Have A Devastating Financial
                Effect.** .............................................................................................................4

        C.      **Defendants' Reasonable Beliefs Leading to the Default Weigh
                Strongly in Favor of Vacatur.**.....................................................................6

        D.      **Defendants Have Meritorious Defenses.**...................................................8

        E.      **The Balance of Equities Weighs in Favor of Litigation On The
                Merits.** ..........................................................................................................12

III.    CONCLUSION............................................................................................................14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Alliance Insurance Co. v. Eagle Insurance Co.*, 92 F.3d 57 (2d Cir. 1996) .................................................................................................................................8

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ....................................9

*Burda Media, Inc. v. Viertel*, 417 F.3d 292 (2d Cir. 2005)..................................................2

*Candido v. District of Columbia*, 242 F.R.D. 151 (D.D.C. 2007)....................................13

*Carl Marks & Co. v. U.S.S.R.*, 665 F. Supp. 323 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 26 (2d Cir. 1988)..................................................................................................................6

*Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994) ......................5

*Compania Interamerica Export-Import, S.A. v. Campania Dominica*, 88 F.3d 948 (11th Cir. 1996)..............................................................................................................4, 5

*Davis v. Musler*, 713 F.2d 907 (2d Cir. 1983) ...................................................................12

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90 (2d Cir. 1993)..................................................8

*Estates of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76 (D.R.I. 2001), *aff'd*, 402 F.3d 274 (1st Cir. 2005)..................................................................................6

*FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 447 F.3d 835 (D.C. Cir. 2006) ...........................................................................................................4, 7, 8

*Gonzalez v. Crosby*, 545 U.S. 524 (2005)...........................................................................2

*Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989).........................................................6

*Hester International Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989) ........................................................................................................................5

*Jackson v. Beech*, 636 F.2d 831, 837 (D. C. Cir. 1980).....................................................13

*Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986) .......................6, 8

*James Electric Co. v. Cougar Enterprises., Inc.*, 111 F.R.D. 324 (D.D.C. 1986).............13

*Massaro v. United States*, 538 U.S. 500 (2003) ..................................................................2

ii

*Nemaizer v. Baker*, 793 F.2d 58 (2d Cir. 1986) ................................................................3

*New York v. Green*, 420 F.3d 99 (2d Cir. 2005) ..............................................................2

*Owens v. Republic of Sudan*, 374 F. Supp. 2d 1 (D.D.C. 2005) ......................................4

*Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995) .............................................................3

*Powerserve International v. Lavi*, 239 F.3d 508 (2d Cir. 2001) .....................................13

*Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987) ..........3

*Sony Corp. v. Elm State Electrics, Inc.*, 800 F.2d 317 (2d Cir. 1986) .............................5

*Standard Oil Co. v. United States*, 429 U.S. 17 (1976) ...................................................2

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d
    Cir. 2004) .......................................................................................................................8

*Tecnart Industria E Comercio Ltda. v. Nova Fasteners Co.*, 107 F.R.D. 283
    (E.D.N.Y. 1985) ...........................................................................................................8

*Thorpe v. Thorpe*, 364 F.2d 692 (D.C. Cir. 1966) .........................................................14

*Transaero v. La Fuerza Area Boliviana*, 24 F.3d 457 (2d Cir. 1994) ............................4

*Estate of Ungar v. Palestinian Authority*, 400 F. Supp. 2d 541 (S.D.N.Y. 2005) ...........6

*Wagstaff-El v. Carlton Press Co.*, 913 F.2d 56 (2d Cir. 1990) ........................................8

## DOCKETED CASES

*Ungar v. Palestinian Authority*, No. 05-mc-00180-GK (D.D.C. 2005) ............................6

## FEDERAL STATUTES

28 U.S.C. § 1608(e) ...........................................................................................................5

Fed. R. Civ. P. 55(c) ..........................................................................................................2

Fed. R. Civ. P. 60(b) ..................................................................................................*passim*

Fed. R. Evid. 1006 .............................................................................................................9

iv

## MISCELLANEOUS

*Estate of Ungar v. Palestinian Auth.*, 2007 N.Y. Slip Op. 6450, 44 A.D.3d 176; 841 N.Y.S.2d 61; (N.Y. App. Div. Aug. 16, 007)..............................................6

*Ungar v. Palestinian Auth.,* No. H/P 4138/05 (Jerusalem Dist. Ct.).........................6

**DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION**

Only recently, Dr. Salam Fayyad (now the Prime Minister and Finance Minister of the Palestinian Authority (PA) and the head of Economic Affairs of the Palestine Liberation Organization (PLO)) became responsible for the positions taken by the PA and the PLO in this lawsuit and others like it. As his attached declaration makes clear, Exhibit A, the Prime Minister acted quickly, determining that Plaintiffs' counsel had filed many similar cases, each resting on the unfounded allegation that Defendants are responsible for every attack that takes place on or near Palestinian territory or is conducted by Palestinians. In total, plaintiffs seek well over $4 billion in these lawsuits.

Defendants filed the instant motion to vacate within months after Prime Minister Fayyad assumed responsibility for litigation involving the PA and PLO and almost immediately after new counsel was retained. In their opposition, Plaintiffs label Defendants' motion to be in bad faith and untimely, launching a host of invective on Defendants and their new counsel. Defendants will not respond in kind, except to reaffirm that theirs is a serious motion, filed in good faith and as swiftly as possible in light of substantial linguistic, logistical and cultural challenges. More importantly, when the Court strips away the invective and compares the legal arguments contained in Defendants' motion with those set forth in Plaintiffs' opposition, it becomes clear that the Court should vacate the default judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure.

I.    RULE 60(B) PROVIDES THE APPROPRIATE VEHICLE FOR VACATUR

Plaintiffs' main procedural argument for denying relief is that Defendants' motion is not cognizable under Rule 60(b) because it supposedly serves as a substitute for an appeal. Opp. at 3-4. Plaintiffs' contention, however, glosses over the basic difference between a direct appeal and the post-judgment procedures contained in Rule 60(b). A direct appeal involves a review of

1

the underlying judgment for error. *Standard Oil Co. v. United States*, 429 U.S. 17, 18-19 (1976); *Massaro v. United States*, 538 U.S. 500 (2003). By contrast, it is black letter law that one of the most common uses of Rule 60(b)(6) is as a vehicle for challenging a default judgment. *E.g.*, *Gonzalez v. Crosby*, 545 U.S. 524, 534-35 (2005); *New York v. Green*, 420 F.3d 99 (2d Cir. 2005). In fact, the federal rules expressly provide for setting aside default judgments using Rule 60(b). *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005) (Fed. R. Civ. P. 55(c) "provid[es] that default judgments may be set aside in accordance with Rule 60(b).").

Rule 60(b) provides the appropriate legal vehicle for vacating the judgment here. The exceptional circumstances demonstrated in Defendants' motion were not part of the earlier record and could not have been part of, or relevant to, any appeal. Indeed, almost immediately after asserting that "[a]ll of the arguments in the instant motion could have been raised in [Defendants'] appeal," Opp. at 3, Plaintiffs complain that Defendants' moving papers are "chock-full of bald factual assertions." Opp. at 4. Plaintiffs thus effectively concede that Defendants seek the very sort of relief that Rule 60(b) contemplates. Moreover, although Plaintiffs quibble over the lack of *sworn* support for these new "factual assertions," Rule 60(b)(6) contains no such requirement. Rather, "in ruling on a motion to vacate a default judgment, all doubts must be resolved in favor of the party seeking relief from the judgment in order to ensure that to the extent possible, disputes are resolved on their merits." *New York v. Green*, 420 F.3d at 104.

In any event, to put these unfounded arguments to rest, sworn declarations are now being provided. Those declarations credibly support Defendants' earlier assertions about the extraordinary circumstances presented by this case, their serious commitment to dispute liability,

the hardship created by the judgment, and the existence of viable defenses. Defendants' request for relief based on exceptional circumstances is thus properly cognizable under Rule 60(b).

## II.    RELIEF UNDER RULE 60(B) IS WARRANTED

Plaintiffs' other arguments against Rule 60(b)(6) relief are similarly unavailing. The Supreme Court and the Second Circuit have confirmed this Court's considerable discretion in ruling on the motion, to be exercised against the backdrop of the preference for merits litigation. *Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-34 (1995) (Rule 60(b) confirms longstanding "inherent and discretionary power . . . to set aside a judgment whose enforcement would work inequity"); *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986) (disavowing "extremely meager" standard relied on by Plaintiffs). Despite this considerable discretion, however, clear patterns emerge. Thus, while Plaintiffs are correct that federal courts dislike willful defaults, Opp. at 9-10, they substantially overstate the case when they claim that relief is "never" appropriate for such defaults. Opp. at 9. In litigation that raises foreign policy concerns and places large sums of a foreign treasury at risk, vacatur remains an appropriate remedy even for willful defaults. The controlling factors are whether the foreign governing entity will participate fully going forward and whether serious issues remain to be litigated. These circumstances exist here.

### A.    The Default Judgment Will Have Significant Foreign Policy Consequences.

As Defendants pointed out in their original motion, Mot. at 7-12, courts disfavor default judgments that carry significant foreign policy consequences. Plaintiffs suggest that this factor is outdated or applies only if statehood has been achieved, Opp. at 12-14, but this is not true. Rather, courts' continuing disfavor of default judgments in this context stems from their effect on foreign relations and the "broad divergence" of "cultural, governmental and political" approaches to litigation when a foreign government is involved. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551 (D.C. Cir. 1987). This is why the D.C. Circuit

reaffirmed just last year that "[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo,* 447 F.3d 835, 838-39 (D.C. Cir. 2006).

It is true that courts have sometimes declined to provide state-owned instrumentalities relief in ordinary contract disputes. *See, e.g., Compania Interamerica Export-Import, S.A. v. Campania Dominica,* 88 F.3d 948, 951-52 (11th Cir. 1996). Indeed, Plaintiffs' main supporting authority, *Transaero v. La Fuerza Area Boliviana,* 24 F.3d 457, 462 (2d Cir. 1994), involved just such a dispute: "[t]he case before us is fundamentally an ordinary contract dispute which has no such profound [foreign policy] implications."

This case, however, does not involve an ordinary contract dispute with a state-owned instrumentality but a claim that the foreign government itself has sponsored a terrorist act. Though the PA does not enjoy the "foreign state" status some foreign entities have, the foreign policy implications here are greater than in other cases in which vacatur was granted. An allegation of terrorist activity against the PA and PLO, with whom the United States has diplomatic relations and views as critical participants in the on-going peace process in the Middle East, has potentially profound implications for our foreign policy. *See Owens v. Republic of Sudan,* 374 F. Supp. 2d 1, 9 (D.D.C. 2005) (vacating default against the Sudanese government due to "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists"). If the Court has any doubt, however, Defendants again invite the Court to seek a Statement of Interest.

B.    **The Default Judgment Will Have A Devastating Financial Effect.**

Courts have been particularly wary of the potential windfall effect of default judgments

4

in cases involving large sums of money. *E.g., Sony Corp. v. Elm State Elecs, Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989). This wariness has been especially acute where the public fisc of a foreign country is at stake. Thus, the Foreign Sovereign Immunities Act strictly protects against default liability, 28 U.S.C. § 1608(e), "reflect[ing] congressional recognition that public fisc should be protected from unfounded claims which would be granted solely because of the government's delay in responding." *Compania Interamerica*, 88 F.3d at 948, 951, citing *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Although the PA is not recognized as a foreign state and does not automatically receive the benefits afforded under FSIA, any default judgment would be paid from the public fisc and identical principles apply.

Concerns about the public fisc are particularly relevant where, as here, the amount of the judgment is $192 million, and would significantly strain already-scarce Palestinian resources. While Plaintiffs dispute the effect of the judgment, Opp. at 15-16, the financial reality for the Palestinians is undeniable. The United Kingdom Foreign Office describes the current state of the PA economy as follows:

> As a result of Israeli restrictions imposed both within the West Bank and Gaza Strip and on Palestinian external economic relations since the start of the Intifada (uprising) in September 2000, the economy has been fragmented. Significant damage has been done to infrastructure, and economic activity and incomes have contracted very sharply. Levels of poverty have increased dramatically, and much of the population is now dependent on food aid.

Exh. B at 3 (Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign & Commonwealth Office's website). Prime Minister Fayyad's declaration further describes the financial effect of these default judgments, as does his earlier letter to Secretary Rice.

The Palestinian taxpayers are as deserving as other taxpayers of being protected from a procedural default. No doubt opposing counsel will assert that the satisfaction of any judgment

would not come at the expense of the Palestinian people, but the U.S. plaintiffs' own collection efforts demonstrate that is not the case. Plaintiffs in *Estates of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76, 86-91 (D.R.I. 2001), *aff'd*, 402 F.3d 274 (1st Cir. 2005), have, for example, sought to attach Arab League funds earmarked for humanitarian aid to the PA, garnish the Value Added Taxes collected by Israel on goods delivered into the Palestinian Territories, and attach funds of the Palestinian Pension Fund for state employees.[1]  The financial implications of refusing to vacate the judgment are indisputably significant, and arguably dire.

C.    **Defendants' Reasonable Beliefs Leading to the Default Weigh Strongly in Favor of Vacatur.**

A default is not "willful," and relief under Rule 60(b)(6) is appropriate, where the default results from a foreign state's actions to protect what, from its perspective, it reasonably perceives to be its legal rights.  *See Gregorian v. Izvestia*, 871 F.2d 1515, 1524-25 (9th Cir. 1989).  A Defendants' belief in its legal position has further been held to be "reasonable" even where that position is ultimately rejected.  *Id.  See also Carl Marks & Co. v. U.S.S.R.*, 665 F. Supp. 323 (S.D.N.Y. 1987) ("the Soviet Union's willful default is tempered by its genuine but unfounded belief that it enjoys . . . sovereign immunity"), *aff'd*, 841 F.2d 26 (2d Cir. 1988).  As the Eleventh Circuit explained in *Jackson v. People's Republic of China*, 794 F.2d 1490, 1496-97 (11th Cir. 1986), "[w]e reject out of hand the contention that in seeking an adjudication of jurisdictional

---

[1] *See, e.g., Ungar v. Palestinian Auth.*, No. 05-mc-00180-GK (D.D.C. 2005) (garnishment action by *Ungar* plaintiffs against humanitarian aid contributed by League of Arab States to the Palestinian people); *Ungar v. Palestinian Auth.*, No. H/P 4318/05 (Jerusalem Dist. Ct.) (action to domesticate Ungar judgment in Israel and attach VAT funds); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541 (S.D.N.Y. 2005) (discussing attempt by plaintiffs to secure money owed by Orascom to Palestinian Pension Fund); *Estate of Ungar v. Palestinian Auth.*, 2007 N.Y. Slip Op. 6450, 44 A.D.3d 176; 841 N.Y.S.2d 61; (N.Y. App. Div. Aug. 16, 2007) (discussing plaintiff's actions with regard to Palestinian Insurance and Pension Fund).

issues arising out of United States domestic law China acts improperly *in reserving what it conceives are its rights under international law*." (emphasis added).

Here, Defendants were understandably confused about the ability of the United States courts to exercise jurisdiction over actions that arose out of the highly charged Israeli-Palestinian conflict.  From Defendants' view, it seemed illogical that American courts could properly adjudicate claims arising from a long-standing and on-going foreign conflict, particularly where the witnesses and evidence were located thousands of miles away.  Accordingly, Defendants acted to protect what they reasonably perceived to be their rights under international law by asserting only jurisdictional defenses.  Although the First Circuit and other district courts ultimately did not accept this legal position, Defendants' approach to the litigation was not so unreasonable as to warrant the imposition of multi-million dollar liability by default.

The question of willfulness is nuanced and heavily dependent on the facts.  The D.C. Circuit has recently emphasized that political turmoil can properly be weighed in the default calculus when it hampers a foreign government's ability to defend.  *FG Hemisphere Assocs., LLC*, 447 F.3d at 841 ("DRC [the Congo] was plainly hampered by its devastating civil war, which cost over three million lives [and] shattered the DRC's already shaky political structure . . . . It is not surprising that the war would be accompanied by substantial confusion over responsibilities in the Foreign Ministry . . .").  Here, at crucial stages of the litigation, the Occupied Palestinian Territories have been in a state of considerable turmoil.

Here also, the United States has reestablished strong diplomatic relations with the PA's new leadership, and has relied on these improved relations in its efforts to broker a peace agreement in the Middle East.  These types of government-to-government relations emphasize not only the constantly-evolving status of the PA's sovereignty, but the importance of this

relationship to the United States. Courts have been especially sensitive to these concerns in the default context. *See, e.g., Jackson*, 794 F.2d at 1496.

Even if the Court were to conclude that Defendants' actions were willful, however, such a finding is not dispositive. The Second Circuit has held that even a willful default judgment may be vacated in extraordinary circumstances. *See Wagstaff-El v. Carlton Press Co.*, 913 F.2d 56, 57 (2d Cir. 1990) (affirming vacatur of default judgment in spite of conclusion that Defendant's conduct was "willful"); *Tecnart Industria E Comercio Ltda. v. Nova Fasteners Co.*, 107 F.R.D. 283 (E.D.N.Y. 1985) (vacating default judgment despite a finding of willfulness). In short, the law on willfulness is far more nuanced than Plaintiffs contend; the balance of factors cuts in favor of Defendants' request for permission to litigate on the merits.

D.    **Defendants Have Meritorious Defenses.**

Relief is also appropriate because meritorious defenses exist. Defendants need not prove they will win the case in order to receive vacatur. Rather, Defendants must establish a serious issue remains to litigate, *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 167-69 (2d Cir. 2004), so that vacatur "will not be an empty exercise or a futile gesture." *FG Hemisphere Assocs. LLC*, 447 F.3d at 842. Thus, a defense is "meritorious . . . so [long] as [the defense] give[s] the factfinder some determination to make." *American Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996). Because default judgments "are generally disfavored," the meritorious defense factor "should be construed generously." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).

Defendants easily satisfy that standard here because, as they have shown in their motion, they did not authorize, finance, or otherwise support the actions leading to Mr. Ellis' shooting, and will vigorously dispute this issue if permitted to do so. Plaintiffs' first response to this argument is to distort it, wrenching an isolated reference to a "lone gunman" in Defendants'

8

motion out of context, and pretending that the Defendants can escape liability only if they can establish that the shooter in this case acted without accomplices. Opp. at 1 & Opp. Ex. A at 4 ¶ 12. This argument can be given short shrift. To proceed under an aiding and abetting theory of liability -- and that is the only theory Plaintiffs have ever asserted -- the Plaintiffs must establish *at the very least* that the *PA* and *PLO knowingly* and *intentionally* aided and abetted those who committed the terrorist act. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002). Thus, the crucial issue at trial will not be whether the shooting was the work of a "lone gunman," but whether the PA and PLO intentionally aided and abetted the shooter.

Plaintiffs direct their second response to this more pertinent issue, asserting that the PA and PLO's involvement with the Ellis' shooting is so clear as to be unworthy of a trial. In Plaintiffs' words, the PA and PLO "know full well that they are liable for Aharon Ellis' murder." Opp. at 22. On this point, Plaintiffs rely almost exclusively on the declaration of Dr. Leonard A. Hammer. Opp. at Ex. A. That declaration lacks any evidentiary value and is decidedly untrue.

The Hammer declaration is curious enough on its face. Dr. Hammer does not purport to have received training in Israeli law (his degrees are from American and British law schools) or to have practiced law in Israeli courts. His declaration thus does not purport to be that of an expert but rather a "response" to assertions in the Defendants' motion, Opp. Ex. A. at 4 ¶ 12, and a "summary" of various Israeli police reports and court documents from the criminal cases of Nasser Awis and Abu al Khadr, two men who were apparently convicted in Israeli trials of accomplice liability for the shooting. Equally puzzling is the nature of this "summary." Dr. Hammer does not assert that the documents he has "summarized" were voluminous or inconvenient to examine but he still fails to include them with his declaration or to make those documents available to opposing counsel or even the court. *Cf.* Fed. R. Evid. 1006 (permitting

9

summaries of "voluminous" documents that cannot be "conveniently examined" but only where copies of originals made available to opposing parties and court).

A review of the proceedings referenced by Dr. Hammer reveals his omission of material facts that bear directly on the reliability of his conclusions. For example, Dr. Hammer's "summary" of the Awis trial fails even to mention that Mr. Awis declined to participate in his own defense, instructed his attorney to remain silent, and was convicted based largely on written confessions purportedly given to Israeli police by alleged accomplices. Dr. Hammer similarly fails to mention that at least one of these witnesses alleged that his out-of-court confession was coerced through torture, and that this allegation finds support in reports by respected Human Rights Organizations.[2] Dr. Hammer also fails to acknowledge that the Israeli court itself wrestled extensively with the question of whether it could base its verdict almost exclusively on this facially unreliable evidence, ultimately concluding that it could only because Mr. Awis' silence at trial waived what would otherwise have been a meritorious objection.

It is impossible to draw *any* reliable factual conclusions from such proceedings. But even if it were, Dr. Hammer's purported "summary" fails to accurately describe the Awis and Khader interrogations, which exculpate Defendants. Defendants attach those documents as Exhibit D. The documents reflect round-the-clock interrogations of both men during the same week that

---

[2] In 1999, in a case brought by the Public Committee Against Torture in Israel (PCATI), the Israeli High Court outlawed the use of torture during interrogation in all cases except for those involving a threat of imminent danger. Nonetheless, PCATI later determined, in a comprehensive report based on hundreds of interviews and extensive investigation of the period between September 2001 and April 2003, that torture during interrogation of Palestinian suspects remained "a matter of course." *See Public Committee Against Torture In Israel*, Back to a Routine of Torture, Torture and Ill-Treatment of Palestinian Detainees During Arrest Detention and Interrogation (September 2001 through April 2003), *available at http://www.stoptorture.org.il/eng/publications.asp?menu=7&submenu=1.*

Israeli defense forces had the entire West Bank under siege and President Arafat confined to a few rooms in his office building. Such interrogations were obviously coercive (at the very least) and occurred when the Israelis were desperately seeking to tie Mr. Arafat to anti-Israeli violence. Thus, any discussions of President Arafat -- and there are stray references in the Awis documents -- can be explained by the circumstances generally, and the interrogations specifically, which included 16-hour overnight sessions that understandably created what Awis later described as a willingness to tell interrogators "what he thought [they] wanted." Ex. D-7 at 000058.

More importantly, both Awis and Khader not only disclaimed PA and PLO sponsorship during these interrogations but described how they were "wanted" by the PA and subject to arrest. Khader, for example, says during the interrogation: "For five months now, he has not received a salary from the Palestinian Authority nor rent payments in Nablus where he is wanted man." Ex. D-9 at 000832. Awis similarly notes that "he wanted to give himself up to the Palestinian Authority, but ultimately decided not to do so." Ex. D-1 at 000010. At another point, Awis describes how the PA arrested a man who had been providing him with funding. Ex. D-3 at 002819.

Such documents utterly refute Dr. Hammer's conclusion that the documents "clearly show that Mr. Ellis was murdered by "a team of PA security officers and PLO operatives." Opp. Ex. A. at 4. Dr. Hammer reaches his conclusion only by conflating all Palestinian groups, selectively inserting "PA and PLO" in place of the groups actually described in the documents. For example, although Dr. Hammer claims "Nasser Awis was serving as an officer with the rank of captain in the PA security services and as the leader of an armed unit of the PLO in Nablus," the documents state, "Defendant [Awis] was the Commander of the Nablus and Northern

Samaria area of the Tanzim-Fatah organization, as well as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Battalions) organization in that area." Ex. D-13 at 1.

Dr. Hammer's conclusions also ignore the general security situation in January 2002. As the attached affidavit of Brigadier General Hazem Attallah makes clear, Exhibit C, membership in the Palestinian security services at that point meant very little; PA security forces were under siege, and it was not unusual at the time to find PA police stations virtually deserted. Indeed, the Awis and Khader documents completely confirm General Attallah's description of the situation, in which a host of militant groups had ready access to weapons, the PA security forces were in a state of near-collapse due to repeated bombing attacks, and both Awis and Khader actively hid their activities from the PA. The concealed actions of absentee or former PA police members cannot establish liability, just as the actions of rogue, AWOL police officers or soldiers do not subject the United States to liability.

In short, the PA has meritorious defenses to liability because it did not sponsor the attack. Although page constraints do not permit a complete discussion of this defense, these examples, as well as a complete review of the current record and General Attallah's declaration, easily suffice to demonstrate a meritorious defense. In the event the Court has any remaining doubts, however, it should hold a hearing in which the evidence can be subjected to adversarial testing. Such a hearing would emphatically demonstrate a meritorious defense.

E.     **The Balance of Equities Weighs in Favor of Litigation On The Merits.**

The final factor the Court must consider is the extent to which vacating the judgment will prejudice Plaintiffs. On this point, "delay alone is not a sufficient basis for establishing prejudice . . . . Rather, it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunities for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983).

Here, Plaintiffs did not suffer cognizable prejudice. Evidence was not lost following the default in September 2005, discovery did not become more difficult, and nothing happened to make fraud or collusion likely. In addition, the active litigation that occurred prior to September 2005 makes it unlikely that Plaintiffs would suffer any prejudice from delay. *Candido v. District of Columbia*, 242 F.R.D. 151, 154-55 (D.D.C. 2007).

As potential sources of prejudice, Plaintiffs point to the death of Yasser Arafat and Hamas' seizure of control over the Gaza Strip. Opp. at 23. However, President Arafat died on November 11, 2004. President Arafat would have thus been unavailable to Plaintiffs even if the September 2005 default had never occurred. Nor is there any reason to believe the situation in Gaza would be relevant. The attack took place in Hadera, in the Haifa district of Israel.

The fact that a damages hearing has already been held is also not a sufficient reason to adhere to the judgment. Just as in *Jackson v. Beech*, 636 F.2d at 837, "[i]t cannot be argued that justice requires the enforcement of a judgment . . . to save the time consumed in two days of hearings and in preparing the eight-page report."

Plaintiffs should, however, receive reasonable costs and expenses incurred as the result of the default. *Powerserve Int'l v. Lavi*, 239 F.3d 508, 515-16 (2d Cir. 2001). Although the Court would be warranted in imposing *only* this condition as part of any order vacating the default, *see James Electric Co. v. Cougar Enterprises., Inc.*, 111 F.R.D. 324, 326 (D.D.C. 1986), Defendants propose one additional condition. To demonstrate that the motion to vacate is not an effort to delay with the plan of again defaulting in the future, Defendants would agree to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the default judgment so that the Defendants can litigate on the merits -- the Defendants again default. The $1 million would not

13

reduce the damages to which the Plaintiffs are entitled, but instead would compensate Plaintiffs for any delay caused by vacatur.

This bond is unusually high. Indeed Defendants, were they not consenting to it, could argue that it is too high. *See Thorpe v. Thorpe*, 364 F.2d 692, 694-95 (D.C. Cir. 1966) (approving bond condition generally but noting that high amount raised due process concerns). However, Defendants' strong desire to litigate brings them to propose such a high bond.

Finally, Plaintiffs suggest that the Ellis family should not be required to testify again about the incident. Opp. at 23. Defendants agree. If the judgment is vacated and Plaintiffs successfully prove liability, Defendants will stipulate to the admissibility of the family's prior testimony in any damages hearing.

## III.    CONCLUSION

This case presents extraordinary circumstances sufficient to warrant granting relief from the default judgment under Federal Rule of Civil Procedure 60(b)(6). The Court should vacate the default judgment under the conditions agreed to by Defendants.

Respectfully Submitted,

November 15, 2007

___/s/_____
Richard A. Hibey
E-mail: rhibey@milchev.com
Mark J. Rochon
E-mail: mrochon@milchev.com
MILLER & CHEVALIER CHARTERED
655 15th St., N.W. Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202)626-5801

*Attorneys for Defendants the Palestine Liberation Organization and the Palestinian Authority*

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of November, 2007, a true and genuine copy of the foregoing was sent by electronic mail and first class mail, postage prepaid to the following:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
Djs@mtlhlaw.com
*Attorneys for Plaintiffs*

Olimpio Lee Squitieri
Squitieri & Fearon, LLP
32 East 57th Street, 12th Floor
New York, NY 10022
Phone: (212) 421-6492
Fax: (212) 421-6553
Lee@sfclasslaw.com
*Attorneys for Plaintiffs*

Robert J. Tolchin
Jaroslawicz & Jaros LLC
225 Broadway, 24th Floor
New York, NY 10007
*Attorneys for Plaintiffs*

_____/s/_____
Mark J. Rochon

15