IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLYE KNOX, et al., ) ) ) Plaintiffs, ) ) v. ) ) THE PALESTINE LIBERATION ) ORGANIZATION, THE PALESTINIAN ) AUTHORITY, et al., ) ) Defendants. ) ) | Civil Action No. 03 CV 4466 (VM) |

## THIRD SUPPLEMENTAL DECLARATION OF
## PRIME MINISTER SALAM FAYYAD

Pursuant to 28 U.S.C. § 1746, I, Dr. Salam Fayyad, declare under penalty of perjury as follows:

1.      I am over eighteen years old, and I am competent to make this Declaration. Unless otherwise stated herein, the facts set forth below are based on my personal knowledge.

2.      I am the Prime Minister and Finance Minister of the Palestinian National Authority ("PNA"). I also serve as the director of the Palestine Liberation Organization's ("PLO") Economic Affairs Department.

3.      I submit this declaration in further supplementation to my declaration dated May 8, 2008, my supplemental declaration dated June 12, 2008, and my second supplemental declaration date July 25, 2008, which I understand were previously submitted in support of the Motion to Reduce Amount of Bond filed by Defendants in the *Knox v. PLO* matter. I also am submitting this declaration in response to a request by the Court during a telephone hearing on July 17, 2008.

4.    I rely on, but will not repeat, the facts in my previously submitted declarations regarding the basis for my knowledge of PNA or PLO assets.  The PNA's dire financial situation, which I described in my earlier declarations, has not improved since I submitted those declarations and, if anything, has worsened.

a.  I attach to this declaration as Exhibits 1, 2, & 3, examples of a few recent public reports documenting the PNA's current financial situation.  One recent *Washington Post* article quotes a senior United States official as noting that the Palestinian government is "really living hand-to-mouth," and that the PNA's budget troubles are "becoming acute."  Ex. 1.  Other recent articles from Israeli papers quote United States Department of State spokesperson Sean McCormack as saying:  "It has been clear for some time that the Palestinian Authority faced a serious and imminent budget crisis."  Ex. 2 at 2; Ex. 3 at 2.  The State Department thus recently "urge[d] all donors to maximize their budgetary support for the Palestinian Authority during this critical time."  Ex. 3.  The attached articles also describe my efforts to secure assistance from international financial organizations, such as the World Bank, and donor nations simply to help the PNA meet existing financial obligations, such as salaries for public sector employees.  *See* Exs. 3 & 4.

b.  When donations come in, those donations that are not earmarked by the donors for particular projects are desperately needed to pay salaries and pension obligations for government employees, to provide basic services, and to service existing debt.  As I explained in my May 8, 2008, declaration, I cannot use donor funds to secure a $192 million bond in this case.  Most of the donor funds come with restrictions on their use.  *See* Ex. 3 at 2; Ex. 4 at 1. Those funds that are unrestricted are absolutely necessary for budgetary support.  Even if I were able to use foreign aid donations to secure a $192 million bond, such a diversion of foreign aid

from its intended use of providing relief in the Occupied Palestinian Territory to use as security for a bond in U.S. tort litigation would not only cause additional political unrest but also would lead to greater reluctance by the international donor community to provide aid to the PNA. At the very least, it would exacerbate the donors' tendency to earmark their aid to particular projects, further reducing the amount of unrestricted aid, which would greatly impair the PNA's ability to direct aid to the areas of greatest need.

5.    *The Court's Requests.*   It is my understanding that the Court requested on July 17, 2008, that the Palestinian National Authority submit a declaration providing the following: (1) any existing inventory of government-owned lands and information on whether there has been any sales or leases of state-owned land in the past year and, if so, the sale or lease prices; (2) information on whether there has been any sales or leases within the past 5 years of government-owned buildings and, if so, the sale or lease prices; (3) information regarding any PNA assets that were not placed into PIF; (4) information regarding the Palestinian Pension Fund for State Administrative Employees in the Gaza Strip ("Pension Fund," or "PPF") -- in particular, (a) whether the PNA has control over PPF assets, (b) whether the PNA has any knowledge of PPF assets, and if so, what those assets are, and (c) whether the PNA has made any withdrawals from PPF assets in the past five years; (5) information regarding a concrete casting facility in the Gaza Strip that the PNA recently obtained as a result of the satisfaction of the judgment in *Bucheit v. PLO*; and (6) information about the relationship of Samed, if any, to the PLO and PNA, including whether the PLO or PNA are the beneficial owners of any of Samed's assets and, if so, a detailed statement of the nature of the assets and their values. I will provide information on most of these topics in the paragraphs below. Other topics are more properly addressed by others with the specific knowledge to address those topics. In such instances, with

3

the assistance of counsel, I have requested that the persons within the PNA or PLO who are most knowledgeable on those topics submit declarations contemporaneously with this filing.

      6.     *Government-Owned Lands and Buildings*.

      a. The Court's questions regarding the existence of an inventory of PNA land and request for data on any sale of PNA-owned land within the past year are addressed in the contemporaneously filed declaration of Sahar Jallad, an Advisor with the Palestinian Land Authority.

      b. The Court's question whether any government-owned buildings have been sold within the last five years is addressed in the contemporaneously filed Declaration of Yousef Al-Zamer, General Accountant, PNA Ministry of Finance.

      c. Regarding the lease of government-owned land or buildings, the PNA's budget has a line item for revenues from the "rental of government properties," which encompasses any income that would be received from the lease of PNA-owned land or buildings. In 2005, the total revenues received by the PNA for the rental of government properties was NIS 670,133 ($188,215). In 2006, revenue from the rental of government properties dropped to NIS 210,302 ($59,066). Revenue for the first half of 2007 was NIS 114,917 ($32,276) and was projected to be NIS 140,000 ($39,321) for the second half of the 2007 and NIS 229,425 ($64,437) for 2008.[1] The information in the budget is relied on in the normal course of government business, and I believe the information regarding rental income to be true and correct. Because the amounts are so insignificant, we have not undertaken the effort of tracking down documentation on specific lease amounts.

----

[1] Currency conversions were done using Oanda.com and show the value in U.S. dollars as of August 28, 2008.

4

7.    *Alleged Portion of PNA Assets Not Placed into PIF.*  It is my understanding that
the Court has requested that I address "whether all assets that the Palestinian Authority is aware
of were placed in the PIF and, if not, where other assets are." Tr. 7/17/08 at 6:6-10. The Court
also requested that I make clear whether I was "unable to corral other as[s]ets, whether [I am]
aware of those assets and whether they are now under the control of the Palestinian Authority."
Tr. 7/17/08 at 10:4-10. In this regard, I note that my earlier supplemental declaration stated: "As
part of that restructuring, I sought to have all PCSC investments, as well as any other commercial
investments held by the PNA, transferred to PIF.  Where assets had minimal or zero value, I
initiated a transparent process to liquidate such assets.  The process of transferring or liquidating
assets yielded no net proceeds to the PNA." Supplemental Declaration at ¶ 8.  I understand the
Court's inquiry to focus on whether I merely "sought" but failed in this effort, or whether I
succeeded in this effort.  I now reaffirm that I made extensive efforts to have every known PCSC
investment, as well as any other commercial investments held by the PNA, transferred to PIF.  I
know of no PCSC investments or commercial investments held by the PNA that were not
transferred to PIF.  Any such assets that were not transferred to PIF were either liquidated or
were of such limited value that they were simply extinguished.

8.    *Pension Fund ("PPF") Assets Other than Custodial Account at SASI (New York).*
The Court requested a "follow-up affidavit that indicates one way or the other in the last,
let's say, five years whether the PA has made any withdrawals from the PPF funds." Tr. 7/17/08
at 16:15-18. The Court also asked that I "indicate in the affidavit whether [I have] knowledge of
the assets held by the PPF, to state affirmatively one way or the other whether [I have] any
control over those assets, and if [I have] any knowledge of the assets . . . to set forth what the
assets are." Tr. 7/17/08 at 17:9-16.

a. By virtue of my role as Finance Minister, I serve as Chairman of the Board of the PPF. As Chairman of the Board of PPF, I am informed of PPF assets. In addition, I have reviewed the most recent audited financial statements for the PPF, dated February 8, 2008, which are for years ending December 31, 2006, and December 31, 2005. The audited financial statements, which are attached as Exhibit 5, list all of the PPF assets of which I am aware.[2]

b. There has been no withdrawal by the PNA of any funds from the PPF in the last five years. In fact, the PNA does not have control over any PPF funds or assets.

c. I have no day to day involvement with the PPF, which is managed and run by others. My role as Chairman of the Board of the PPF does not allow me to direct any transfer of funds from the PPF to the PNA, as the pertinent laws under which the PPF was created do not permit any such transfer or the use of PPF funds for anything other than PPF-related purposes.

d. The PNA is, in fact, heavily indebted to the PPF. According to the PPF, the PNA currently owes the PPF $600 million. This massive debt is largely attributable to the following: (1) employee PPF contributions withheld by the PNA from employee wages that have not yet been remitted to the PPF; and (2) unpaid employer contributions from the PNA for its own employees who participate in the PPF pension fund system. The audited financial statements show "Accrued Contributions, Loan Installments and Interest" of NIS 1,542,032,966.54 (US $432,032,771.00) for year ending December 31, 2006. *See* Ex. 5 at 3, 10. PNA government employee and employer pension contributions owed to the PPF by the PNA account for the vast majority of that debt, with amounts owed by the Municipalities and the Palestine Electricity Distribution Company ("PEDC") accounting for only a small percentage of

---

[2] The PPF is referred to in the audited financial statements as the "Gaza Insurance and Pension General Corporation," or "GPIC."

the amount owed. In fact, the payment arrears is so significant that Footnote 8/1 to the PPF audited financial statements cautions that the "continuous delay of payments from the Ministry of Finance and the Municipalities could affect the future ability of the GPIC to meet its commitments towards the beneficiaries." *Id.* at 10. The PNA is placed in the impossible predicament of having to choose between paying current salaries to its employees or making their pension fund payments, and has had to choose the former by necessity.

e. The $600 million debt to the PPF also includes monies owed in connection with funds transferred to PPF accounts in 1996 and 1998 totaling $28 million and used as collateral. I was not involved with either the Pension Fund or the PNA government at the time of these transfers. Though I have no personal knowledge on the issue, the funds were, as I understand it, deposited into PPF accounts at a local bank and used as collateral for loans made by the bank to the PNA. When the PNA defaulted on those loans, the funds were seized by the loaning bank. The current Account Receivable to the Pension Fund for the funds that were used as collateral and seized by the loaning bank in 1996 and 1998 is NIS 119,019,733.96, or US $33,345,866.00. *See* Ex. 5 at 3 (under "Assets"); *id.* at 8.

9.    *Bucheit Concrete Casting Facility.* It is my understanding that the Court has inquired about a "cement workshop" that was signed over to the PNA in connection with the resolution of the litigation in *Bucheit v. PLO.* Specifically, I understand that the Court asked the PNA to "indicate whether the cement workshop has been sold, if so, at what price and, if not, has it been appraised and at what value." Tr. 7/17/08 at 20:22-24. In my supplemental declaration dated June 12, 2008, I make reference in paragraph 12(c) to a concrete fabrication workshop, and I understand the Court to be asking about that facility. At my direction, the attorneys for the PNA and PLO in this matter have asked Attorney Sharhabeel Al Zaeem, who practices in Gaza

and who is familiar with the facility, to address this subject. Attorney Al Zaeem is submitting a declaration contemporaneously with the filing of this declaration.

10.    *PNA Bank Accounts.* I understand that the Court has asked for more information about PNA bank accounts. Specifically, I understand that the Court has asked the PNA to "identify the accounts, the balances and any documents that evidence encumbrances on the accounts." Tr. 7/17/08 at 22:22-24. I further understand that the Court has requested that we "make the production as of January 2008." *Id.* at 24:25-25:1. I have asked Yousef Al-Zamer, General Accountant, PNA Ministry of Finance, to file a responsive declaration on the question of PNA bank accounts. It is my understanding that Mr. Al-Zamer is doing so contemporaneously with the filing of this declaration and that the documents requested by the Court will be submitted with Mr. Al-Zamer's declaration.

11.    *Samed.* The Court has requested that I provide "some sworn statement . . . about the relationship of Samed, if any, to the PLO and Palestinian National Authority and whether it does hold any financial assets that the PLO or PNA is the beneficial owner of." Tr. 7/17/08 at 25:25-26:4. There is no financial relationship between the PNA and Samed. In my capacity as Director of the PLO's Economic Affairs Department, I am not aware of any financial relationship between the PLO and Samed. Moreover, I am not aware of any such relationship from any other source of information. I am not personally familiar with Samed's structure or finance. Therefore, I understand that counsel have asked individuals with more extensive knowledge of the PLO and Samed to address this issue. In that regard, I understand that declarations of Yasser Abed Rabbo (the current Secretary General of the PLO) and Yaser Shaqbu'a (the Palestine National Fund's Chief Financial Officer) will be submitted simultaneously with this declaration.

8

12.   *PLO / Palestine National Fund ("PNF") Accounts.*  The Court asked for PLO /
PNF bank account statements and representations as to PLO / PNF assets.  I understand that
Yaser Shaqbu'a, the Chief Financial Officer of the PNF (the PLO treasury), has addressed the
Court's request in a declaration that will be filed simultaneously with this declaration.  However,
Mr. Shaqbu'a's declaration does not address an Arab Bank account in Ramallah denominated as
a PLO-Economic Affairs Department account, because it is not an account over which the PNF
exercises control.  When Hamas won the legislative elections at the beginning of 2006, the U.S.
and the European Union refused to provide aid to the Hamas-led PNA and banks refused to
transfer aid from Arab-nation donors to the PNA for fear of running afoul of U.S. anti-terror
funding laws.  The PLO-Economic Affairs Department account was established to provide a
channel for providing foreign aid funds to the Palestinians that would not be subject to control by
Hamas.  Because the PNA is so dependent on foreign aid, in May 2007, the U.S. agreed that aid
could be provided for the payment of government employee salaries and other essential
budgetary support if it was channeled through this PLO account.  *See* Ex. 6 (Reuters, "U.S.
Approves Aid Channel to Palestinian Finance Minister," May 17, 2007).  At that time, as now, I
was Director of the PLO Economic Affairs Department as well Finance Minister of the PNA.
Foreign aid directed to the PLO-Economic Affairs Department account is spent in accordance
with restrictions placed on the aid by the donors and is used for the benefit of the Palestinian
people and for budgetary support for the PNA.  The statements for the PLO-Economic Affairs
Department account at the Arab Bank are submitted with the declaration of Yousef Al-Zamer,

General Accountant, PNA Ministry of Finance, along with the other PNA bank account

statements.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on this **2 9** ᵀᴴ day of August, 2008, in Ramallah, Occupied Palestinian

Territory.


Dr. Salam Fayyad
Prime Minister of the Palestinian National Authority
Finance Minister of the Palestinian National Authority
Director of the Economic Affairs Department of the PLO