IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLYE KNOX, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE PALESTINE LIBERATION ORGANIZATION, THE PALESTINIAN AUTHORITY, et al., <br><br> Defendants. | Civil Action No. 03 CV 4466 (VM) |

## DECLARATION OF YOUSEF AL-ZAMER

Pursuant to 28 U.S.C. § 1746, I, Yousef Al-Zamer, declare under penalty of perjury as follows:

1. I reside in Ramallah, Occupied Palestinian Territory.

2. I am over eighteen years old, and I am competent to make this declaration. I read and understood this Declaration before I signed it. I read and understand both English and Arabic. Unless otherwise stated herein, the facts set forth below are based on my personal knowledge.

3. I hold a BA degree from Bethlehem University and an MA degree in accounting from Jerusalem University. I have practiced as an accountant continuously since 1988.

4. I have worked at the Ministry of Finance of the Palestinian National Authority ("PNA") since 1994. I served as a Director from 1996 to 2005, and then as the Director General of the Treasury Department from 2005 until assuming my current position. Since 2008, I have been the General Accountant at the Ministry of Finance. In that position, I report directly to Dr. Salam Fayyad, in his capacity as Finance Minister.

5. In my current position, I supervise all accounting and financial operations of the PNA, including the maintenance of all accounts held by the PNA in commercial banks that comprise the PNA's single treasury account; the financial and accounting implementation of the agreements the PNA has with various donor nations that provide the PNA with essential financial support; and the PNA's compliance with the line of credit and loan agreements it has with commercial banks under which the PNA borrows money to meet its operating needs.

6. I have read two declarations of Prime Minister Fayyad that I understand were submitted in support of Defendants' Motion to Reduce Amount of Bond on May 8, 2008 ("Fayyad Declaration") and on June 12, 2008 ("Fayyad Supplemental Declaration") (collectively, "Fayyad Declarations"). This Declaration provides additional details in support of the information contained in the Fayyad Declarations.

7. In paragraph 13 of his Supplemental Declaration, Prime Minister Fayyad stated that, as of June 11, 2008, the PNA owed approximately $211.6 million under loans made by various banks to the PNA, the individual balances of which were listed in Exhibit D to the Fayyad Supplemental Declaration. An updated list of those loan balances as of July 8, 2008, follows, and reflects that the total PNA obligations under those loans has increased since June 11, 2008, to $234.1 million. Attached collectively as Exhibit 1 are the July 8, 2008, bank statements for each of the loan accounts listed below:

| Loan | Current Balance with Interest (Dollars) |
| --- | --- |
| Jordan Kuwait Bank | 7,015,580.20 |
| Al Quds Bank for Development and Investment | |
| • Loan 1 | 10,261,055.09 |
| • Loan 2 | 30,000,000.00 |
| Bank of Palestine, PLC | 28,814,102.49 |
| Palestine International Bank | 25,691,981.91 |
| Egyptian Arab Land Bank | 24,404,983.50 |
| Arab Bank | |
| • Loan 1 | 55,742,284.57 |

2

|  |  |
|---|---:|
| • Loan 2 | 5,272,106.75 |
| • Loan 3 | 15,636,264.28 |
| Palestine Investment Bank |  |
| • Current debit | 5,129,710.67 |
| • Loan 1 | 11,383,621.84 |
| • Loan 2 | 14,796,417.19 |
| **TOTAL** | **234,148,108.49** |

8.  In paragraph 14 of his Supplemental Declaration, Prime Minister Fayyad stated that the PNA also has credit facilities at the Bank of Jordan, the Cairo Amman Bank, and the Bank of Palestine pursuant to which the PNA obtains access to funds in order to meet its operating costs. The following are additional details in further support of that statement:

   a.  The PNA has entered into line-of-credit agreements with the Bank of Palestine, the Cairo Amman Bank and the Bank of Jordan, certified translations of which are attached as Exhibits 2, 3 and 4, respectively. Under those agreements, the banks permit the PNA to borrow funds up to certain limits specified in the agreements. As the PNA draws down money under those lines of credit, interest begins accruing on such borrowed funds at interest rates agreed upon with the banks. At the discretion of the banks, the PNA has been allowed at times to exceed the borrowing limits specified in the agreements for specific, limited periods of time. This is done with the understanding that, before the end of such periods, the PNA would be receiving funds from tax and non-tax revenues collected by the Ministry of Finance and other ministries, as well as clearance revenues -- which are revenues earned as a result of the commercial transactions between Palestine and Israel -- and would use those funds to pay down the PNA's outstanding balance on the lines of credit with the banks. At no time since the PNA entered into these line-of-credit agreements has the PNA ever been able to eliminate its debt with any of the three banks.

3

b.  Attached collectively as Exhibit 5 are bank statements for the PNA's line of credit account at the Bank of Palestine reflecting month-end balances of the PNA's line of credit account for the period January-June 2008. The line of credit limit for that account is NIS 220 million ($65,348,411). The PNA's single treasury account (account number 206777) consists of various sub-accounts divided according to different currencies, the largest of which is account number 000/1602/099/0206777-5, held in Shekels. The PNA also has a number of other sub-accounts at the Bank of Palestine linked to PNA revenue-producing activities (i.e. customs, property taxes, licenses, fees and fines) into which revenues are deposited. At the end of each day, their amounts are swept into the single treasury account, so that those sub-accounts holding daily revenues return to a zero balance. As summarized in the following chart, the attached bank statements reflect that, as of June 30, 2008, the PNA had a substantial net-negative balance on its line of credit account at the Bank of Palestine that exceeds $90 million, which is in excess of its approved line of credit limit. This represents an interest- accruing debt obligation of the PNA:

| DATE | Account 0206777-5 000/3001/001 (Dollars) | Account 0206777-5 000/1602/099 (Shekels) | Account 0206777-5 000/3001/029 (Dinars) | Account 0206777-5 000/3001/033 (Euros) | Account 0206777-5 000/3001/002 (Australian Guineas) |
|---|---|---|---|---|---|
| 6/30/08 | -2,270.38 | -314,368,443.10 | 11.63 | 643.03 | 1.73 |
| 5/31/08 | 139,178.28 | -256,369,454.59 | 2,116,532.20 | 60.06 | 1.23 |
| 4/30/08 | 1,822,666.00 | -289,032,329.01 | 2,176,717.02 | 23.06 | -98.26 |
| 3/31/08 | -247,257.94 | -417,689,439.83 | 809,578.47 | 978,090.75 | 66.75 |
| 2/28/08 | 10,032.99 | -216,333,593.61 | 189,843.89 | 511,115.60 | 71.48 |
| 1/31/08 | 3,396,291.83 | -199,465,914.05 | 32,906.93 | 727,406.60 | 97,663.80 |
| 1/1/08 | 9,016.08 | -119,880,694.62 | 119,876.97 | 493.60 | 1.20 |

c.  Attached collectively as Exhibit 6 are bank statements for the PNA's line of credit account at the Bank of Jordan reflecting month-end balances of the PNA's line of credit account for the period January-June 2008. The line of credit limit for that account is NIS 120

4

million ($35,644,588). Revenues from fees and taxes collected by the Ministry of Transportation are held in the Bank of Jordan. In a manner similar to the one described in paragraph (b) above, their amounts are swept into the primary Bank of Jordan account (account number 035-201-9810058-036) at the end of each day, so that those sub-accounts holding revenues from the Ministry of Transportation return to a zero balance. The PNA's primary Bank of Jordan account consists of various sub-accounts divided according to different currencies. The largest of these is, as noted above, account number 035-201-9810058-036, held in Shekels. As summarized in the following chart, the attached bank statements reflect that, as of June 30, 2008, the PNA had a substantial net-negative balance on its line of credit account at the Bank of Jordan that exceeds USD $38 million, which is in excess of its approved line of credit limit. This represents an interest- accruing debt obligation of the PNA:

| DATE | Acct. 035-201-9810058-036 (Shekels) | Acct. 002-201-9810058/002 (Dollars) | Acct. 034-201-9810058-006 (Euros) | Acct. 001-201-9810058-006 (Dinars) |
|---|---|---|---|---|
| 6/30/08 | -83,271,880.97 | -6,781,340.51 | -1,633,385.58 | -3,725,342.37 |
| 5/31/08 | -81,748,778.90 | -6,578,149.79 | -1,616,259.78 | -3,687,155.79 |
| 4/30/08 | -74,066,777.51 | -6,148,038.99 | -1,603,830.10 | -3,635,029.32 |
| 3/31/08 | -38,828,591.45 | -5,714,045.63 | -1,591,890.92 | -3,554,286.62 |
| 2/28/08 | -86,421,033.91 | -5,453,179.57 | -1,579,648.64 | -3,373,371.28 |
| 1/31/08 | -90,886,869.39 | -5,118,402.62 | -1,568,278.62 | -3,323,150.49 |
| 1/1/08 | -104,865,222.24 | -4,996,482.63 | -1,556,217.93 | -3,205,456.85 |

      d.     Attached collectively as Exhibit 7 are bank statements for the PNA's line of credit account at the Cairo Amman Bank reflecting month-end balances of the PNA's line of credit account for the period January-June 2008. The line of credit limit for that account is NIS 225 million ($66,833,602). As summarized in the following chart, the attached bank statements reflect that, as of June 30, 2008, the PNA had a substantial net-negative balance on its line of

credit account at the Cairo Amman Bank that exceeds USD $66 million, which is in excess of its approved line of credit limit. This represents an interest- accruing debt obligation of the PNA:

| DATE | Account No. 22/102/138702/00 (Shekels) |
|---|---|
| 6/30/08 | -225,469,453.09 |
| 5/31/08 | -224,447,312.55 |
| 4/30/08 | -201,032,691.55 |
| 3/31/08 | -171,024,247.34 |
| 2/28/08 | -190,580,509.89 |
| 1/31/08 | -193,848,434.22 |
| 1/1/08 | -164,886,567.47 |

    e.    Based on the terms of the line of credit agreements with the Bank of Palestine, Bank of Jordan and the Cairo Amman Bank, the course of dealings between the PNA and the three banks, and the outstanding debt balances reflected in subparagraphs (b)-(d) above, the three lines of credit are not now (and will not be in the future) available, sufficient or approved by any of the banks for the posting of a bond to secure the amount of the judgment entered in the above-captioned action. Even if the lines of credit were theoretically available, sufficient and approved for such a purpose, the PNA would have no ability to pay the interest on such a borrowing or the underlying debt itself. Finally, it is not possible to increase the existing lines of credit beyond the existing limits and the overdraft amounts based on the terms and restrictions that the banks have been imposing on the PNA with respect to the existing lines of credit regarding the need for demonstrable sources of incoming funds to reduce the accumulated borrowings.

    9.    The PNA maintains various donor and non-donor accounts at the Arab Bank. I describe the donor accounts in paragraph 11. The non-donor accounts, which are account numbers 9090-100084-510, 9090-100084-530, and 9090-100084-570, are used to meet the

PNA's various obligations. For example, on a monthly basis, the amount in Account No. 9090-100084-510 is used to service the outstanding loans to the Arab Bank described in paragraph 7 above; in fact, if the PA is ever late on its monthly service payment to the Arab Bank, the Arab Bank has the right to resume debiting Account No. 9090-100084-510 automatically for the monthly loan payments going forward. Additionally, amounts in Account No. 9090-100084-570 are used for the PNA's monthly salary obligations. Attached collectively as Exhibit 8 are bank statements for the three main non-donor sub-accounts that the PNA maintains at the Arab Bank (i.e., Account Nos. 9090-100084-510, 9090-100084-530, and 9090-100084-570) reflecting month-end balances of those accounts for the period January-June 2008. As summarized in the following chart, the attached statements reflect that, as of June 30, 2008, the PNA had a balance of approximately USD $3 million in these three accounts at the Arab Bank:

| DATE | Acct. 9090 100084-510 (Dollars) | Acct. 9090 100084-530 (Euros) | Acct. 9090 100084-570 (Shekels) |
|---|---|---|---|
| 6/30/08 | 3,087,423.73 | -40.62 | 177,180.57 |
| 5/31/08 | -247,542.79 | 943,148.38 | 6,132,313.16 |
| 4/30/08 | 0.23 | 943,149.27 | 90,690.31 |
| 3/31/08 | -28,677.16 | 943,151.17 | 5,685,530.81 |
| 2/28/08 | 89,349.25 | 44,680.85 | 8,008,941.87 |
| 1/31/08 | 13,437,442.71 | 30,897.79 | 255,975,806.24 |
| 1/1/08 | 1,110,050.78 | 902,314.24 | 12,037,455.29 |

10. For the reasons described in paragraphs 8 and 9, as well as my knowledge and experience as the General Accountant and the General Director, I agree with Prime Minister Fayyad's statement in paragraph 28 of his Declaration that "the PNA cannot obtain financing from private lenders for a $192 million bond" and that, "[e]ven if it were possible to secure such financing, the terms would be so onerous that the PNA would not be able to service the debt given its budget deficit."

7

11. In paragraph 27 of his Declaration, Prime Minister Fayyad stated "[t]he PNA is dependent on substantial foreign aid simply to meet its basic budgetary requirement" and that, "[w]hen making pledges of aid, the donor countries often direct that the aid be targeted to particular uses, which would not include use as collateral for a bond in U.S. litigation." The following are additional details in further support of that statement:

    a. I am responsible for the maintenance and disbursement of funds donated by donor countries to the PNA pursuant to donor agreements, and I regularly communicate with representatives from the donor countries regarding such activities. My activities relating to such donor agreements also include communicating with auditors and other representatives of the donor countries who are involved in reviewing and auditing the transactions and accounts relating to the donor agreements to ensure the PNA's compliance with the donor agreements.

    b. As described generally in paragraph 27 of Prime Minister Fayyad's Declaration, most of the donor agreements that the PNA has with donor nations contain numerous restrictions regarding the control and use of donated funds. Those restrictions are enforced by the use of outside auditors employed by firms such as Ernst & Young and Price WaterhouseCoopers, who maintain an ongoing and regular presence at the Ministry of Finance offices, on behalf of the donor countries. These controls are inconsistent with the use of such funds for the posting of a bond in this action.

    c. For example, attached as Exhibits 9 and 10 are copies of agreements between the United States Government and the PNA governing the donation of $80 million by the U.S. Government to the PNA. Exhibit 9 is the master agreement dated August 2, 2007, entitled "Framework Agreement" governing the donation, which was signed by U.S. Secretary of State Condoleezza Rice and Prime Minister Fayyad. That agreement, among other things, (i)

mandates that the funds shall be used "exclusively" for the purpose of "supporting the security sector through training and non-lethal equipment" (Exhibit 9, Sections 2, 5.1(a)); (ii) requires the PNA to segregate the funds in a "sub-account" at a bank acceptable to the U.S. Department of State (*id.*, Section 5.1); (iii) obligates the PNA to return to the U.S. Department of State "any interest earned on the funds in the separate sub-account" and any funds not used by a certain date (*id.*, Sections 5.1(b), 5.5(c)); and (iv) subjects the funds and the sub-account to audit by, and regular reporting to, the U.S. State Department (*id.*, Sections 5.3, 5.4). Exhibit 10 is a letter agreement dated August 2, 2007, entitled "Implementation Letter No. 1," signed by the U.S. Consul General Jacob Walles and Prime Minister Fayyad by which the U.S. Government and the PNA began to implement the August 2, 2007 Framework Agreement (Exhibit 9). The August 2, 2007 Implementation Letter No. 1 specifies, among other things, that "[t]he withdrawal of funds from the Separate Sub-Account is subject to the prior written approval of the Department of State" (*id.*, Section 1(b); *see also id.* Section 3), which in practice must been given by U.S. Consul General Jacob Walles at my request for any disbursements from the sub-account relating to the U.S. donation covered by the Framework Agreement.

    d.  Attached as Exhibits 11, 12, and 13 are examples of other donor agreements, specifically donor agreements between the PNA and the Government of Germany (Exhibit 11), the Government of Italy (Exhibit 12), and the European Community (Exhibit 13), that govern specified donations from those donor countries to the PNA, that limit the use of the donated funds to specific purposes (for example, Exhibit 13, Annex II, Appendix 2 (specifying services permitted for "Eligible Expenditures") and that mandate specific procedures for the maintenance, audit and withdrawal of the donated funds.

e. Donations from donor countries and other restricted funds are deposited in certain sub-accounts, under account numbers 9090-480002, 9090-480887 and 9090-100084, at the Arab Bank. Sub-accounts are established, typically, at the request of donor countries, in order to comply with donor-agreement restrictions. Attached collectively as Exhibit 14 (a-l) are statements of account sent by the Arab Bank reflecting the balances in the various donor sub-accounts during the period January 1, 2008 to July 29, 2008: Exhibit 14a (as of 6/30/08), 14b (as of 6/1/08), 14c (as of 5/29/08), 14d (as of 5/4/08), 14e (as of 4/30/08), 14f (as of 4/1/08), 14g (as of 3/31/08), 14h (as of 3/2/08), 14i (as of 2/28/08), 14j (as of 2/3/08), 14k (as of 1/31/08), and, 14l (as of 1/2/08).

f. Based on my knowledge of the donor agreements and the understandings between the PNA and donor countries, I agree with the statement of Prime Minister Fayyad in paragraph 27 of his Declaration that the funds in the donor accounts are not available for use as collateral for a bond in U.S. litigation for the reasons he stated.

12. The PNA does not maintain bank accounts in any banks other than those identified in this Declaration.

13. In my role as the General Accountant, my greatest challenge monthly is to meet the payroll of the PNA's employees in a timely manner, which I am frequently not able to do.

14. It is my understanding that on July 17, 2008, the Court directed the Palestinian Authority to provide information regarding any government-owed buildings that have "been sold or leased within the last five years, and if so, at what value." There have not been any sales of government-owned buildings in the last five years by the PNA, either in the West Bank or in the Gaza Strip.

15. In paragraph 24 of his Supplemental Declaration, Prime Minister Fayyad stated that "the primary source of funds in PLO accounts is monthly budgetary support given by the PNA for wages and salaries and operation expenses." In my current position, I am responsible for the approval and issuance of the payments from the PNA to the PLO described by the Prime Minister in paragraph 24 of his Supplemental Declaration. It is the understanding that the payments the PLO receives from the PNA will be used exclusively for the PLO's wages, salaries and operational expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this **28** day of August, 2008, in Ramallah, Occupied Palestinian Territory.

_____
Yousef Al-Zamer
General Accountant
Ministry of Finance
The Palestinian National Authority